**Richard J. Harris Law, PC**
Richard J. Harris (SBN 013859)
rjharrislaw@gmail.com
4000 Hickory Fairway Dr.
Woodstock, GA 30188
Telephone: 480-708-9111

**Provost Umphrey Law Firm**
Edward Fisher, Esq.
Texas State Bar No. 24012624
(Pro Hac Vice Admission)
efisher@pulf.com
350 Pine Street, Suite 1100
Beaumont Texas, 77701
Tel: (409) 835-6000
FAX: (409) 813-8682

**Provost Umphrey Law Firm**
Bryan O. Blevins, Jr.
Texas State Bar No. 02487300
(Pro Hac Vice Admission)
bblevins@pulf.com
350 Pine Street, Suite 1100
Beaumont Texas, 77701
Tel: (409) 835-6000
FAX: (409) 813-8682

**Provost Umphrey Law Firm**
Patrick Barrett
Texas Bar No.: 00787042
(Pro Hac Vice Admission)
4205 Hillsboro Pike, Suite 303
Nashville, TN 37215
615-463-4000
pbarrett@pulf.com
Attorneys for Plaintiff
Jane Doe (D.H)

1

**SECOND AMENDED COMPLAINT**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF ARIZONA**

Jane Doe (D.H.), an individual,              )
                                    Plaintiff )
                                              )
v.                                            )
                                              )
, Scottsdale Inn, LLC d/b/a Howard            )
Johnson, PRC Investment LLC  d/b/a            )
Howard Johnson, Parimal Parmar, and           )
Wyndham Hotels & Resorts, Inc.,               )
                                              )
                                    Defendants. )
                                              )

No. CV-23-00759-PHX-JJT
**SECOND AMENDED COMPLAINT**

Assigned to the Honorable
John J. Tuchi, Judge

COMES NOW Plaintiff Jane Doe (D.H.), by and through the undersigned counsel, and respectfully submits her Second Amended Complaint for damages and makes the following averments.

**SUMMARY**

**1.**    Jane Doe (D.H.) is a survivor of sex trafficking. She was repeatedly and regularly trafficked at the Howard Johnson located at 7110 E Indian School Rd Scottsdale, AZ 82521 ("Scottsdale Howard Johnson").

**2.**    The Scottsdale Howard Johnson was jointly operated by Wyndham Hotels & Resorts, Inc. ("Wyndham") and Scottsdale Inn, LLC, PRC Investment LLC, and Parimal Parmar (collectively "Scottsdale Inn"). Scottsdale Inn provided "boots on the ground" at the Scottsdale Howard Johnson, while Wyndham directly participated in and controlled relevant hotel operations, including by playing a central role in the rental of rooms and through intimate involvement in aspects of operations related to the detection of and

response to sex trafficking. Scottsdale Inn and the hotel staff also acted as the agents of Wyndham when operating the Scottsdale Howard Johnson.

3.     This case is about how Wyndham and Scottsdale Inn each derived a financial benefit from widespread use of the Scottsdale Howard Johnson for sex trafficking, including the trafficking of Jane Doe (D.H.). Despite obvious and apparent signs of sex trafficking at the Scottsdale Howard Johnson, Wyndham and Scottsdale Inn continued renting hotel rooms for use in trafficking and operated the Scottsdale Howard Johnson in a way that enabled sex trafficking, including by creating a haven where traffickers could operate without disruption from hotel staff and with minimal risk of detection and traceability.

4.     Jane Doe (D.H.) files this civil lawsuit under the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §1581, et seq, for the harms and losses she suffered because of the sex trafficking she endured at the Scottsdale Howard Johnson, which Wyndham and Scottsdale Inn each benefited from and facilitated.

## JURISDICTION & VENUE

5.     This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the TVPRA.

6.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this claim occurred in this District and Division.

7.     Jane Doe (D.H.) was trafficked in this District and Division.

**SECOND AMENDED COMPLAINT**

**PARTIES**

8.    Jane Doe (D.H.) is a natural person who is currently a resident and citizen of California.

9.    Defendant Scottsdale Inn, LLC d/b/a Howard Johnson is a duly qualified and licensed limited liability company in the State of Arizona. It has been served in this matter and has appeared through counsel.

10.    Defendant PRC Investment LLC is an Arizona limited liability company. It has been served in this matter and has appeared through counsel.

11.    Defendant Parimal Parmar is an individual residing in Arizona/ He has been served in this matter and has appeared through counsel.

12.    Defendant Wyndham Hotels & Resorts, Inc. d/b/a Howard Johnson ("Wyndham") is a Delaware corporation with its principal place of business in New Jersey. It has been served in this matter and has appeared through counsel.

**FACTS**

**Jane Doe (D.H.) was a Victim of Unlawful Sex Trafficking at a Hotel Owned, Operated, Managed, and Controlled by Defendants.**

13.    Jane Doe (D.H.) is a victim of sex trafficking under 18 U.S.C. §1591(a) and §1595(a). She was first trafficked in 2012 while she was a minor, and her trafficking continued after she turned 18. Her trafficker used physical violence, threats, and other forms of coercion to require Jane Doe (D.H.) to engage in commercial sex for his financial benefit. Throughout 2013, Jane Doe (D.H.) was repeatedly trafficked at the Scottsdale Howard Johnson. Jane Doe (D.H.) remained under the control of her trafficker through at

4

**SECOND AMENDED COMPLAINT**

least 2014.

14.    Jane Doe (D.H.) first came under the control of her trafficker when she was a minor. Her trafficker used false promises of a romantic relationship and financial security to gain control over Jane Doe (D.H.). When she was only 16 years old, her trafficker took her on shopping sprees and used emotional connection to make her dependent on him and isolate her from others. After Jane Doe (D.H.) was dependent on her trafficker, he manipulated her into performing commercial sex for his financial benefit. He maintained control over Jane Doe (D.H.) by threatening and beating her when she did not earn enough money for him and by continually exploiting the emotional and financial dependence that he induced.

15.    Jane Doe (D.H.)'s trafficker operated mainly out of hotels, moving Jane Doe (D.H.) and other victims around between various hotels where there was demand for commercial sex and where they could successfully operate without interference by the staff and with minimal risk of detection or traceability by third parties. Throughout 2013, while she was just 18 years old, Jane Doe (D.H.) was repeatedly and regularly trafficked at the Scottsdale Howard Johnson.

16.    Jane Doe (D.H.)'s trafficker used the control he maintained through the above-described methods to require Jane Doe (D.H.) to engage in commercial sex at the Scottsdale Howard Johnson. Jane Doe (D.H.) was repeatedly harbored, maintained, provided, solicited, and exploited at this hotel.

**The Hotel Industry's Role in Sex Trafficking and Defendants' Knowledge of the Problem**

5

**SECOND AMENDED COMPLAINT**

**17.** What Defendants knew or should have known about the sex trafficking that was occurring in their jointly operated hotel, including the trafficking of D.H., is shaped by the widely known and pervasive relationship between the hotel industry and sex trafficking.

**18.** Defendants are aware of the important role that hotels play in the proliferation of sex trafficking and of the revenue they derive from sex trafficking, both directly and indirectly, from sex trafficking that occurs at their properties.

**19.** Today, sex slavery is pervasive in the United States, and hotels are the primary place where it happens.[1] For years, sex traffickers have "been able to reap these profits with little risk when attempting to operate within hotels."[2] In 2014, 92% of calls received by the National Human Trafficking Hotline involved reports of sex trafficking

---

[1] "This is not only a dominant issue, it's an epidemic issue." *See* Jaclyn Galucci, *Human Trafficking is an Epidemic in the U.S. It's Also Big Business*, Fortune (April 2019), https://fortune.com/2019/04/14/human-sex-trafficking-us- slavery/ (citing Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council). "It's also something that is hiding in plain sight. It's everywhere—it's absolutely everywhere." *Id.*

[2] *See Human Trafficking in the Hotel Industry*, Polaris Project (Feb. 10, 2016), https://polarisproject.org/blog/2016/02/10/human-trafficking-hotel-industry; *see also* Eleanor Goldberg, *You Could Help Save A Trafficking Victim's Life With Your Hotel Room Pic*, Huffington Post (June 2016), http://www.huffingtonpost.com/entry/taking-a-photo-of-your-hotel-room-could-help-save-a-trafficking-victimslife_us_57714091e4b0f168323a1ed7.

**SECOND AMENDED COMPLAINT**

taking place at hotels.[3] Hotels have been found to account for over 90% of commercial exploitation of children.[4]

20.    Because of this link between hotels and sex trafficking, government bodies, law enforcement agencies, non-profits, and hotel trade associations, including the United States Department of Homeland Security, the National Center for Missing and Exploited Children, the Polaris Project, the Texas Attorney General, Love 146, EPCAT, among others, have devoted significant efforts to intervening and educating the hotel industry, including each of the Defendants, on best practices for identifying and responding to sex trafficking..[5]

21.    This resulted in the development of specific "red flags" for the detection of sex trafficking. Law enforcement agencies and other organizations with subject-matter expertise identified specific indicators of the presence of sex trafficking at a hotel. The signs of sex trafficking in a hotel environment follow well-established patterns and can

---

[3] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hotel Industry*, Cornell Hotel Report (Oct. 2015), https://scholarship.sha.cornell.edu/cgi/viewcontent.cgi?article=1222&context=chrpubs.

[4] *See* Erika R. George and Scarlet R. Smith, *In Good Company: How Corporate Social Responsibility Can Protect Rights and Aid Efforts to End Child Sex Trafficking and Modern Slavery*, 46 N.Y.U. J. Int'l L. & Pol. 55, 66-67 (2013).

[5] United States Department of Homeland Security Blue Campaign – One Voice. One Mission. End Human Trafficking, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf (last visited April 13, 2023); National Center for Missing and Exploited Children, https://www.missingkids.org/theissues/trafficking#riskfactors (last visited April 13, 2023); Love 146, *Red Flags for Hotel & Motel Employees*, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf (last visited April 13, 2023); Texas Attorney General, *Human Trafficking Red Flags,*

**SECOND AMENDED COMPLAINT**

easily be detected by appropriately trained staff. From check-in to check-out, there are indicators that traffickers and their victims routinely exhibit during their stay at a hotel. These recurring indicators are known as "red flags" of sex trafficking.

22.    Recognized "red flags" of sex trafficking that are considered indicators of trafficking that can be observed by staff throughout a hotel[6] include:

- individuals who appear to be with a significantly older "boyfriend" or in the company of much older males;
- a group of girls who appears to be traveling with an older female or male;
- a group with similar tattoos, which can indicate "branding" by a trafficker;
- individuals showing fear, anxiety, tension, submissiveness and/or nervousness;
- individuals who seem disoriented;
- individuals showing signs of physical abuse;
- individuals showing signs of restrain or confinement;
- individuals showing signs of malnourishment, poor hygiene, fatigue, or sleep deprivation;
- individuals with signs of untreated illness or injuries;
- individuals who appear to lack freedom of movement;
- individuals who are being constantly monitored and/or escorted around the hotel;
- individuals who avoid eye contact;
- individuals who avoid interactions with others;
- individuals who are not in possessions of their own identification;
- individuals who have few or no personal possessions;
- individuals who dress provocatively;

---

https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf (last visited April 13, 2023).
[6] *See id.*

8

**SECOND AMENDED COMPLAINT**

- a high volume of men who are not registered guests entering and exiting a room; and
- individuals who wait in common areas while other men frequent the room.

23.    Recognized "red flags" of sex trafficking that can be detected by front-desk staff and hotel security[7] include:

- patrons appeared distressed at check-in;
- the same person reserving multiple rooms;
- rooms paid for with cash or prepaid cards;
- rooms are paid for one day at a time;
- requests for isolated rooms or rooms close to an exit;
- use of hotel computers for adult oriented or sexually explicit websites;
- patrons not forthcoming about identifying information when registering;
- individuals checking in but then leaving a room only infrequently, not at all, or at odd hours;
- individuals lack identification;
- car in the parking lot is parked so license plate is not visible;
- individual present who avoids eye contact, does not communicate, and is accompanied by someone else who appears to speak for them; and
- individual appears to be giving scripted responses.

24.    Recognized "red flags" of sex trafficking that can be detected by housekeeping, maintenance, and room service staff[8] include:

- constant use of the "Do Not Disturb" sign;
- requests for housekeeping services (towels, linens, etc.) but denying staff entry into the room;
- refusal of cleaning services for multiple days;

---

[7] *See id*.
[8] *See id.*

**SECOND AMENDED COMPLAINT**

- excessive amounts of cash in a room;
- presence of multiple computers, cell phones, pagers, or other technology;
- the same person reserving multiple rooms;
- individuals leaving the room infrequently, not at all, or at unusual hours;
- individuals loitering in hallways or appearing to monitor a room;
- excessive alcohol in a room;
- illegal drugs in a room;
- evidence of pornography;
- excessive number of people staying in a room;
- guests with few or no personal possessions in room;
- provocative clothing and shoes;
- constant flow of men into a room at all hours; and
- excessive amounts of sex paraphernalia in rooms.

25. The organizations who developed these "red flags," then educated and trained the hotel industry about them. For example, the United States Department of Homeland Security's Blue Campaign initiative issued specific guidance to the United States hotel industry through a "Hospitality Toolkit" describing human trafficking warning signs that could be detected by various categories of hotel staff. [9]

26. Before Jane Doe (D.H.)'s was ever trafficked at the Scottsdale Howard Johnson, each Defendant was educated and trained on these "red flags" of sex trafficking. The organizations that developed these "red flags" identified them as indicators specific to sex trafficking in a hotel environment. At all relevant times, each Defendant acknowledged

---

[9] / Department of Homeland Security, Blue Campaign Toolkit, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.; www.doj.state.wi.us/sites/default/files/ocvs/human%20trafficking/Hospitality%20Toolkit%20-%20English%20-%20Wisconsin%20AG%20Office%281%29.pdf

**SECOND AMENDED COMPLAINT**

and recognized these "red flags" specifically as signs of sex trafficking and instructed and trained their staff to treat them as signs of sex trafficking when observed in the hotel.

27.    It is, and has at all relevant times, been well established that signs of commercial sex in a hotel environment are "red flags" for the presence of sex trafficking.

28.    There is a well-known link between commercial sex in a hotel environment and sex trafficking. The United States Department of Justice and other agencies and organizations have recognized that most individuals involved in commercial sex are subject to force, fraud, or coercion.[10] As a result, these women are victims of sex trafficking.

29.    Most federal sex trafficking prosecutions involve individual traffickers acting as "pimps" who are operating without direction from or connection to a larger criminal network.[11] It is well known that the "traffickers in hotel/motel based commercial sex situations are often individual controllers, more commonly known as 'pimps.'"[12]

30.    State, local, federal, and international governments and law enforcement agencies have long recognized the link between commercial sex and sex trafficking. For example:

- "The U.S. Government adopted a strong position against legalized prostitution in a December 2002 National Security Presidential Directive

---

[10] *See, e.g.*, *A National Overview of Prostitution and Sex Trafficking Demand Reduction Efforts, Final Report*, https://www.ojp.gov/pdffiles1/nij/grants/238796.pdf; *Prostitution and Trafficking in Women: An Intimate Relationship*, https://www.ojp.gov/ncjrs/virtual-library/abstracts/prostitution-and-trafficking-women-intimate-relationship.

[11] Human Trafficking Institute, 2020 Federal Human Trafficking Report 28 (2021), https://traffickinginstitute.org/wp-content/uploads/2022/01/2020-Federal-Human-Trafficking-Report-Low-Res.pdf.

[12] National Human Trafficking Hotline, *Hotel-Motel Based*, https://humantraffickinghotline.org/en/sex-trafficking-venuesindustries/hotelmotel.

**SECOND AMENDED COMPLAINT**

based on evidence that prostitution . . . . fuels trafficking in persons, a form of modern-day slavery."[13]

- In 2006 the United Nations Commission on Human Rights, Special Rapporteur or Trafficking in Persons recognized that "[f]or the most part, prostitution, as actually practiced in the world, usually does satisfy the elements of trafficking."[14]

- By 2008, a report of the Illinois Criminal Justice Information Authority concluded "young women in the sex trade who are controlled by a pimp should not be regarded as girls in prostitution, but as victims of violence who need assistance in safely exiting prostitution."[15]

- In 2010, the Anaheim Police Department (APD) recognized that a significant portion of those involved in prostitution who it came into contact with were likely trafficking victims and adopted a new approach that focused on rescuing women from their pimps and redirecting their lives.[16]

- In 2013, the New York State Court System launched the Human Trafficking Intervention Initiative recognizing that many individuals who end up in criminal courts are on prostitution charges "are recruited into the commercial sex industry by force, fraud, and/or coercion."[17]

31. When governmental bodies, law enforcement agencies, non-profits, and hospitality-industry organizations developed the "red flags" of sex trafficking for the hotel industry, they recognized that signs of commercial sex are and should be treated as signs of sex trafficking. Based on the known link between commercial sex and trafficking and

---

[13]United States Department of State, *The Link Between Prostitution and Sex Trafficking* https://2001-2009.state.gov/r/pa/ei/rls/38790

[14] U.N. Escor, Comm'n on Human Rights, *13 Integration of the Human Rights of Women and a Gender Perspective, Report of the Special Rapporteur on the Human Rights Aspects of the Victims of Trafficking in Persons, Especially Women and Children, ¶ 42 U.N. Doc. E/CN.4/2006/62 (Feb. 20, 2006) (Sigma Huda)

[15]https://humantraffickinghotline.org/sites/default/files/Domstic%20Sex%20Trafficking%20Chicago%20-%20ICJIA.pdf

[16] Steve Marcin, *Prostitution and Human Trafficking: A Paradigm Shift*, Law Enforcement Bulletin, https://leb.fbi.gov/articles/featured-articles/prostitution-and-human-trafficking-a-paradigm-shift#:~:text=After%20close%20analysis%20of%20prostitutes,tactic%20in%20addressing%20the%20problem.

[17] Center for State Court Innovation, *State Court Snapshot: New York State's Human Trafficking Intervention* Courts, https://cjinvolvedwomen.org/wp-content/uploads/2016/12/HTIC-1pager.pdf

12

**SECOND AMENDED COMPLAINT**

the patterns of sex trafficking in hotels, these entities recognized that certain signs associated with commercial sex are important indicators for the ultimate detection of sex trafficking in a hotel.

32. Each Defendant knew that the link between commercial sex in a hotel environment and sex trafficking was sufficiently strong that ordinary prudence required treating signs of commercial sex activity as signs of sex trafficking. Under the circumstances, ordinary prudence further required each Defendant to avoid benefiting from rental of its rooms for commercial sex because doing so was associated with a strong probability that Defendants were thereby benefiting from the harboring of sex trafficking victims.

33. This same conclusion is echoed by others who seek to eliminate sex trafficking in the hospitality industry, including the American Hotel Lodging Association: "Hotel employees who have undergone training are more aware of trafficking when it happens – and are more willing to report it – than those who have not been trained.[18] In reference to companies like the Defendants, ECPAT observed: "If they do nothing to raise awareness or to prevent child trafficking, they risk becoming an indirect and unintentional conduit for the abuse that takes place."

34. Because of the prevalence of human trafficking in hotels and the established body of knowledge about how hotels can detect and respond to signs of sex trafficking, it has long been apparent that the decision of a hotel or hotel chain to continue generating

---

[18] AHLA, *Free Online Training*, https://www.ahla.com/issues/human-trafficking (last visited April 13, 2023).

**SECOND AMENDED COMPLAINT**

revenue from traffickers without taking necessary steps to identify and deter trafficking is a conscious decision to financially benefit by supporting and facilitating unlawful sex trafficking.

**Prevalent Sex Trafficking at Wyndham Branded Hotels was Well Known by Wyndham.**

35. Defendants' actual knowledge is *not* limited to a general awareness of the problem of sex trafficking in the hotel industry. They have known, since well before Jane Doe (D.H.)'s trafficking that sex trafficking was ongoing and widespread at Wyndham properties and at the Scottsdale Howard Johnson.

36. In fact, the problem of sex trafficking at Wyndham hotels was sufficiently well known that, in 2011, there was a public petition with thousands of signatures to stop Wyndham hotels from supporting child sex. Although Wyndham publicly committed to take steps to stop facilitating trafficking, this promise proved empty; the Wyndham brand has been named a "major contributor to sexual exploitation" and part of the "dirty dozen list" by the National Center on Sexual Exploitation.[19]

37. In the past twenty years, Wyndham-branded properties have been mentioned in at least two hundred criminal trafficking cases filed by the federal government. Wyndham monitored criminal activity occurring at its branded hotels and was aware of activity indicating commercial sex trafficking or related crimes occurring at those branded hotels, including the Scottsdale Howard Johnson where Jane Doe (D.H.) was trafficked.

---

[19] https://endsexualexploitation.org/wyndham/

**SECOND AMENDED COMPLAINT**

**38.**    Information that has become public through news stories establishes the entrenched and pervasive nature of Wyndham's role in providing a venue where sex trafficking has continued unabated for years. Wyndham monitored news stories and online reviews for indicia of criminal activity at their branded locations, including sex trafficking. Examples of news stories confirm the widespread presence of sex trafficking, prostitution, and related criminal activity at Wyndham hotels:

- In 2008, there were a series of arrests at a New York Howard Johnson that was being used as a brothel under the "watchful eye" of hotel staff, including for exploitation of underage runaways, which resulted in an order requiring the hotel to close.[20]

- In denying a summary judgment motion of the franchisee of a New York Howard Johnson hotel in a tort suit filed by the family of a man who was killed at the hotel, a court noted "overwhelming documentary and testimony evidence establish that [the franchisee] was both aware of extensive and violent criminal activity on its premises and that it failed to maintain any security, let alone adequate security."[21] This included a "pattern of prostitution."

- In 2011, news broke that street gangs in California were running an underage-sex-trafficking ring out of two Wyndham properties, including a Howard Johnson.[22]

- In 2012, a man sex trafficked two minors at Wyndham properties, including a Howard Johnson, in Michigan before being arrested at another hotel.[23]

- In 2013, police arrested a man for sex trafficking of minors following a prostitution sting at a Howard Johnson hotel in California.[24]

---

[20] https://www.qchron.com/editions/eastern/sex-trade-busts-near-jfk-shake-up-illicit-business/article_44ce701d-0c82-5376-a220-8e7a40bb1b26.html
[21] Davis v. Commack Hotel, LLC, 2016 NY Slip Op 30298(U), ¶ 6 (Sup. Ct.)
[22] https://journalism.berkeley.edu/projects/should-hotel-chains-be-held-liable-for-human-trafficking/
[23] https://www.mlive.com/news/grand-rapids/2012/02/alleged_victims_testify_in_tee.html
[24] https://thecoastnews.com/man-arrested-in-sting-held-without-bail/

**SECOND AMENDED COMPLAINT**

- In 2013, a Howard Johnson in California was ordered by the San Diego City Attorney to make significant changes to its operations to abate prevalent prostitution activity on its premises.[25]

- More than 40 people were arrested for drug trafficking and sex trafficking related offenses arising from a Howard Johnson hotel in Pennsylvania, which was allowed to serve as a "safe haven for criminal activity" between 2011 and 2019. The company that owned the hotel and the general manager were both convicted of sex trafficking related offenses.[26]

- In 2014, a man was arrested for human trafficking charges after operating out of Florida hotels, including a Howard Johnson property.[27]

39.    These articles are only limited representative examples. There are many similar articles about sex trafficking and other associated criminal activity at Wyndham branded hotels. Moreover, on information and belief, Wyndham was aware of additional significant law enforcement activity related to trafficking at its hotels that was not reported in the media.

40.    Reviews of Howard Johnson branded properties, which upon information and belief Wyndham monitored regularly, also show both the pervasiveness of sex trafficking at Howard Johnson properties and Wyndham's knowledge of the same. For example:

- An Expedia review from 2010 for a Howard Johnson in Florida states "There was a prostitute trying to sell her self to my Husband and his friend in the lobby that was very unprofesssional."[28]

---

[25] https://www.sandiego.gov/sites/default/files/nr130228.pdf

[26] https://www.justice.gov/usao-mdpa/pr/hotel-owner-two-hotel-companies-sentenced-sex-and-drug-trafficking-monroe-county

[27] https://archive.tcpalm.com/news/vero-beach-man-charged-with-human-trafficking--video-ep-456198732-341865991.html/

[28] https://www.expedia.com/Orlando-Hotels-Howard-Johnson-By-Wyndham-Airport-Florida-Mall.h1635018.Hotel-Reviews

**SECOND AMENDED COMPLAINT**

- A Yelp review from 2012 for a Howard Johnson in Maryland states "I stayed here for two nights in October 2011. This was a mistake that I will never repeat again, however cheap the rate may be. The moment my family arrived, we saw a prostitute walking around the parking lot, talking to a couple different guys. Once we were checked in we headed to our room with some of the bags. When we put some in and turned back out to get some more, we saw her and one of the guys slip into the room next door, while the other guy she spoke to waited in his car, perhaps for his turn. A maid knocked on their door during this "session" and my mom, walking by to get to our car, saw the prostitute open the door with just a pillow blocking her body. . . .  Before we left the second night, my mother accidentally pulled up the sheet on the bottom mattress on her bed and found a gigantic, horrifying brownish-reddish stain that reminded us of blood. The size of this stain could only have been the result of past violence, and I am lead to wonder why the heck HoJo didn't replace the mattress after it suffered this kind of trauma? That's freaking disgusting!!!"[29]

- A TripAdvisor review from 2012 for a Howard Johnson in Washington states "Hotel staff was doing nothing about the prostitution going on in theirmidst. Someone reported a drug deal and the staff was only concerned about their money! The carpets were disgusting, beds not made and room with fore hazards! The trash was not removed nor was the bathroom cleaned. Onkaar the owner allows convicts to work for him and let's his front desk staff rip off his tills."[30]

- A Yelp review from 2013 for a Howard Johnson in Connecticut states "I've seen with my own eyes drug deals, prostitutes, druggies here to party. There was even a shooting here in June rumored to have to do with drugs and prostitution! We've had to call security over 5 times due to fights and the noise here is unbelievable! Woken up in the middle of the night several times due to noise.also, an unsafe exterior. The parking lot is dark, and the exterior door to the building is supposed to lock at 10pm and only guests with keycards can get in, but the doors never locked. Also, people hang out in the halls at all hours of the night. . . ."[31]

- A TripAdvisor review from 2013 for a Howard Johnson in Colorado states "pimps and hookers there all the time 24/7."[32]

---

[29] https://www.yelp.com/biz/howard-johnson-by-wyndham-college-park-college-park
[30] https://www.tripadvisor.co.za/Hotel_Review-g58537-d100448-Reviews-or40-Howard_Johnson_Inn_Kent-Kent_Washington.html
[31] https://www.yelp.com/biz/howard-johnson-milford?sort_by=elites_desc
[32] https://www.tripadvisor.com/Hotel_Review-g33364-d224982-Reviews-or20-Howard_Johnson_by_Wyndham_Colorado_Springs-Colorado_Springs_El_Paso_County_Colorado.html

17

**SECOND AMENDED COMPLAINT**

- A TripAdvisor review from 2019 for a Howard Johnson in Oregon states "Unbelievably terrible. We have called and complained, E mailed details, and here we are fillinmg out a survey for a facility that deserves absolutely no response. We had an absolutely unacceptable stay there, between the druggie, pimp, prostitute, Police and Fire response (to a stabbing?), room boor forced open as we slept, next door room being broken into, room not made up, etc!"[33]

- An Expedia review from 2020 for a Howard Johnson in Indiana states "There seems so be some illegal activity like prostitution or human trafficking going on. You need to take care of this problem."

- An Expedia review from 2020 for a Howard Johnson in Florida states "Do not stay at this hotel, I believe they are in on a sex trafficking scheme. An middle aged white woman continued to harass my room and management did nothing about it. I had to go to the front desk at 12am to get a room change, they then told corporate I never mentioned an issue to them."[34]

- An Expedia review from 2022 for a Howard Johnson in Iowa states "What was worse though is im pretty sure this hotel is heavily used as either a prostitution place or sex trafficking, and i think the staff is in on it."[35]

41.    These reviews are limited representative examples. There are many similar online reviews for Howard Johnson branded hotels, and, on information and belief, there are additional similar reviews and other customer complaints from before 2013 that are not currently available on the internet, but which Wyndham knew about.

42.    Public statements confirm that Wyndham knew sex trafficking was a problem at Wyndham branded hotels and that it retained control over the response of Wyndham branded hotels to sex trafficking. Wyndham has recognized its "critical role in

---

[33] https://www.tripadvisor.co.za/Hotel_Review-g52024-d112203-Reviews-or435-Howard_Johnson_by_Wyndham_Portland_Airport-Portland_Oregon.html
[34] https://www.expedia.com/Tampa-Hotels-Airport-Inn.h3530.Hotel-Reviews
[35] https://www.expedia.com.sg/Cedar-Rapids-Hotels-Motel-6-Cedar-Rapids.h13484.Hotel-Reviews

18

**SECOND AMENDED COMPLAINT**

increasing awareness and prevention" of sex trafficking in their hotels.[36] The Wyndham brand has publicly claimed to be taking steps to avoid facilitating sex trafficking in its hotels since at least 2011.[37]

43.    Unfortunately, while these statements reflect actual knowledge of the problem of sex trafficking at their branded hotels, they reflect only a public relations strategy rather than a genuine commitment to stop facilitating trafficking and to stop receiving benefits from that trafficking. Wyndham has refused to publish reports to show its progress, or lack thereof, on the EPCAT goals to combat sex trafficking in its hotels.[38] Emails among Wyndham company executives reflect a hesitance to commit to meaningful anti-trafficking measures and a desire to avoid negative publicity without any significant burden.[39]

44.    News stories, online reviews, guest complaints, public statements, and law enforcement efforts establish that, at the time Jane Doe Jane Doe (D.H.) was trafficked at the Scottsdale Howard Johnson, Wyndham knew or should have known:

> a. The use of Wyndham branded properties for sex trafficking was not limited to one location or geographic region but was a widespread problem;
>
> b. Commercial sex work occurring at Wyndham branded properties involved trafficking and compelled prostitution;

---

[36] https://hotelsmag.com/news/wyndham-implements-anti-prostitution-training/
[37] https://hotelsmag.com/news/wyndham-implements-anti-prostitution-training/
[38] https://thecode.my.salesforce-sites.com/apex/MemberProfilenew?id=0019000000GxgPrAAJ&year=2023
[39] https://journalism.berkeley.edu/projects/should-hotel-chains-be-held-liable-for-human-trafficking/ ("Scott McLester, Wyndham's former general counsel and chief compliance officer, wrote in an e-mail to the company's then C.E.O., Stephen Holmes, 'Even though we have been hesitant to commit to everything the [EPCAT] Code was asking for, the issue is not going away and it's starting to impact commercial relationships.' McLester added that the organization's 'concern about being 'bullied' into signing the Code is outweighed by the relative harmlessness of the Code itself.'")

19

**SECOND AMENDED COMPLAINT**

    c. Wyndham franchisees and hotel staff were not taking reasonable steps to deter, detect, and disrupt known or probable sex trafficking occurring at Wyndham hotel properties;

    d. Their efforts, if any, to stop facilitating sex trafficking in Wyndham branded properties were not effective; and

    e. They were, by their acts and omissions, facilitating sex trafficking at Wyndham branded properties by providing venues where that trafficking was occurring widely and without sufficient detection or deterrence.

45. Despite the mounting evidence that sex trafficking at Wyndham branded properties was ongoing and growing, Wyndham did not change course. Wyndham chose to continue earning revenue and profits from renting out space in their hotels as a venue for trafficking.

**Wyndham and Scottsdale Inn had actual or constructive knowledge of the widespread and ongoing sex trafficking at the Scottsdale Howard Johnson.**

46. At all relevant times, Wyndham and Scottsdale Inn also knew or should have known that sex trafficking was prevalent at the Scottsdale Howard Johnson specifically because there was widespread sex trafficking on site that followed well-established patterns and presented with obvious signs that Wyndham and Scottsdale Inn knew and acknowledged to be indicators of sex trafficking in a hotel environment.

47. Other victims were trafficked at the Scottsdale Howard Johnson at the same time as Jane Doe (D.H.). She would sometimes be required to share a room with other victims of her trafficker who—like Jane Doe (D.H.)—were and looked like teenagers.

48. Jane Doe (D.H.)'s trafficker and the other traffickers repeatedly chose to use the Scottsdale Howard Johnson for their sex trafficking activity because of policies and

**SECOND AMENDED COMPLAINT**

practices that created a favorable environment for trafficking and because hotel staff turned a blind eye to signs of trafficking. The traffickers operated with minimal expenditure of time and resources on concealment due to an implicit understanding with the Scottsdale Howard Johnson that they could operate without risk of disruption.

49.    Law enforcement records reflect that there were numerous dispatches to the Scottsdale Howard Johnson before, during, and after the period that Jane Doe (D.H.) was trafficked there due to the obvious signs of the criminal activity that the hotel allowed to occur on site, including activity associated with sex trafficking.

50.    The signs of this widespread sex trafficking activity were sufficiently obvious that it was noticed by guests. For example, a 2014 online review notes the hotel "had HOOKERS coming and going all the time."[40] Upon information and belief, in addition to online reviews, customers made complaints about the obvious signs of this sex trafficking activity to the hotel staff and to Wyndham through the channels it established for customer feedback.

51.    Based on hotel reviews, guest complaints and records of law-enforcement calls, there were multiple victims trafficked at the Scottsdale Howard Johnson before, during, and after Jane Doe (D.H.)'s trafficking. This trafficking followed a repetitive and routine procedure at the Scottsdale Howard Johnson and there were "red flags" of trafficking that were observed by hotel staff and management, including: paying with cash or prepaid cards, having high volumes of men who not registered guests in and out of their

---

[40] https://www.tripadvisor.com/Hotel_Review-g31350-d74158-Reviews-or70-Howard_Johnson_by_Wyndham_Scottsdale_Old_Town-Scottsdale_Arizona.html

**SECOND AMENDED COMPLAINT**

room at unusual times, arriving with few possessions for extended stays, and other signs consistent with the "red flags" of trafficking identified above.

52.    All knowledge from the staff at the Scottsdale Howard Johnson is imputed to Scottsdale Inn who thus knew about or was willfully blind to the trafficking at the Scottsdale Howard Johnson based on the direct observation of hotel staff, including management-level staff. This knowledge is also imputed to Wyndham based on the existence of an agency relationship as described below.

53.    Scottsdale Inn also knew or should have known about the sex trafficking at the Scottsdale Howard Johnson based on:

   a.  surveillance of the property;

   b.  internal investigations;

   c.  customer complaints;

   d.  monitoring of customer feedback;

   e.  information received from law enforcement;

   f.  and other sources of non-public information available to Franchisee.

54.    Wyndham required Scottsdale Inn and hotel staff to report suspected criminal activity at the Scottsdale Howard Johnson, including suspected sex trafficking, to Wyndham.

55.    Based on the obvious signs of sex trafficking at the Scottsdale Howard Johnson, Scottsdale Inn was required to, and upon information and belief did, report numerous instances of suspected sex trafficking to Wyndham prior to the trafficking of Jane Doe (D.H.).

**SECOND AMENDED COMPLAINT**

**56.**     Wyndham also knew or should have known about the trafficking at the Scottsdale Howard Johnson based on:

    a.   The obligation of hotel staff and Scottsdale Inn to report suspected criminal activity, including sex trafficking, to Wyndham;

    b.   Wyndham's regular monitoring of online reviews;

    c.   Wyndham's collection and monitoring of customer surveys and complaints;

    d.   Wyndham's requirement that Scottsdale Inn submit regular and detailed reports to Wyndham about day-to-day hotel operations;

    e.   Wyndham's collection and monitoring of data about guests at the Scottsdale Howard Johnson, including but not limited to room reservations, identification and payment information, data from websites visited on Wi-Fi, and other guest data;

    f.   Wyndham's supervision and control over day-to-day operations of the Scottsdale Howard Johnson through detailed information and extensive reports that it obtained through the property management system and other software systems it required franchisee to use and through which franchisee was obligated to allow Wyndham to obtain real-time data to allow it to monitor hotel operations on a day-to-day basis;

    g.   Wyndham's regular inspections of the Scottsdale Howard Johnson;

    h.   Wyndham's employment of "field agents" to work with hotels on security issues, including trafficking issues;

    i.   Wyndham's access to surveillance and security systems;

    j.   Information provided to Wyndham by law enforcement; and

    k.   Other sources of information available to Wyndham.

**57.**     Wyndham observed obvious "red flags" of numerous instances of sex trafficking occurring at the Scottsdale Howard Johnson based on their supervision and monitoring of the property. As a result, Wyndham knew or should have known that the

**SECOND AMENDED COMPLAINT**

Scottsdale Howard Johnson was facilitating widespread sex trafficking involving multiple traffickers and numerous victims prior to the trafficking of Jane Doe (D.H.).

**Defendants knew or should have known that Jane Doe (D.H.) D.H. Was Trafficked at the Scottsdale Howard Johnson.**

58.     One of the lives devalued and otherwise adversely affected by Defendants' inattention to the detection and deterrence of sex trafficking was Jane Doe (D.H.).

59.     Throughout 2013, Jane Doe (D.H.)was repeatedly trafficked for sex at the Howard Johnson located at 7110 E Indian School Rd Scottsdale AZ 85251. She estimates that she was trafficked at the Scottsdale Howard Johnson more than 5 separate times, with the length of her stay each time varying based on how much money she was earning for her trafficker. She would often stay for several days at a time.

60.     During the period that Jane Doe (D.H.) was trafficked at the Scottsdale Howard Johnson, there were obvious "red flags" of the activity that led to her sex trafficking.

61.     On repeated visits to the Scottsdale Howard Johnson, Jane Doe (D.H.) often encountered and interacted with the same staff members from visit to visit. For example, there was a maintenance employee who recognized Jane Doe (D.H.) and always tried to make conversation with her. This maintenance employee was frequently in the area of the hotel near Jane Doe (D.H.)'s room and repeatedly observed clear signs of the "red flags" of Jane Doe (D.H.)'s trafficking.

62.     Some of the obvious "red flags" associated with Jane Doe (D.H.)'s trafficking included:

24

**SECOND AMENDED COMPLAINT**

- Jane Doe (D.H.), a teenager who looked like a high school student, would arrive at the hotel with nothing more than a backpack. Throughout her stay, she would be seen in the presence of much older men and with much older men coming and going from her room.

- At times, Jane Doe (D.H.) would arrive with other trafficking victims, who were also teenagers.

- The hotel rooms in which Jane Doe (D.H.) was trafficked were frequently paid for with cash or prepaid card and Jane Doe (D.H.) dressed provocatively and avoided eye contact and interactions with others when checking in. At the time of check-in, cash would be used to pay for one or two nights. After this, Jane Doe (D.H.) would be required to go to the front desk and pay for additional nights with cash she earned.

- The "Do Not Disturb" sign was used constantly. D.H. requested room or housekeeping services (additional towels, new linens, etc.) but denied staff entry into the room and refused cleaning services for multiple days. Jane Doe (D.H.) would request towels and linens and take them at the door. She would also hand hotel staff a full trash bag at the door without letting them enter.

- When staff was allowed into the room, they would have seen large amounts of cash and sex paraphernalia (condoms, lubricant, lotion, etc.) and smelled bodily fluids and musk.

- Jane Doe (D.H.)'s trafficker required her to use hotel internet and/or hotel computers to post ads online on adult websites, and this activity was detectable to Defendants who monitored internet at activity at the hotel.

   There was also heavy foot traffic in and out of Jane Doe (D.H.)'s room involving men who were not hotel guests. Jane Doe (D.H.) was forced to see more than 10 johns per day while at the Scottsdale Howard Johnson. These individuals entered and left at unusual hours and were present at the hotel for brief periods of time, which are signs of sex trafficking that hotel staff observed.

63.    Commercial sex trafficking was so pervasive at the Scottsdale Howard Johnson, local law enforcement conducted a sting operation  while Jane Doe (D.H.) was there. Upon information and belief, Scottsdale Inn and Wyndham were made aware of this sting operation. Despite this, they continued renting rooms that were used for trafficking of Jane Doe (D.H.).

25

**SECOND AMENDED COMPLAINT**

**64.** Multiple employees at the Scottsdale Howard Johnson, including management-level employees, observed or were made aware of these obvious "red flags" while acting within the scope and course of their employment.

**65.** As such, Scottsdale Inn knew or was willfully blind to the fact that Jane Doe (D.H.) was being trafficked at the Scottsdale Howard Johnson.

**66.** Given these obvious signs, Wyndham knew or should have known about the trafficking activity that resulted in the trafficking of Jane Doe (D.H.) pursuant to its policy or protocol under which Scottsdale Inn and hotel staff were required to, and upon information and belief did, report this suspected sex trafficking activity to Wyndham.

**67.** Wyndham also knew or should have known about the activity that led to Jane Doe (D.H.)'s trafficking based on the numerous tools, described above, through which Wyndham monitored and supervised the Scottsdale Howard Johnson. These tools gave Wyndham notice of the "red flags" of the trafficking activity associated with Jane Doe (D.H.)'s trafficking.

**68.** Wyndham also had constructive knowledge of the activity that resulted in the trafficking of Jane Doe (D.H.) at the Scottsdale Howard Johnson because that activity was accompanied by such recognized "red flags" of sex trafficking that it was readily detectable through the exercise of ordinary diligence. If Wyndham had exercised ordinary prudence in areas of operations over which it retained control or in which it directly participated, Wyndham would have detected and stopped benefiting from this sex trafficking activity at the Scottsdale Howard Johnson:

    a. Wyndham retained control over, assumed responsibility for, and were

**SECOND AMENDED COMPLAINT**

directly involved in training and education of hotel staff regarding the detection of sex trafficking. If Wyndham had exercised ordinary prudence in creating, providing, and enforcing this sex trafficking activity would have been detected.

b. Wyndham retained control over, assumed responsibility for, and affirmatively participated in the development, implementation, and enforcement of policies, procedures, and practices regarding the detection of and response to suspected sex trafficking at the Scottsdale Howard Johnson. If Wyndham had exercised ordinary prudence in adopting, implementing, and enforcing policies and protocols, then this sex trafficking activity would have been detected.

c. Wyndham played a primary role in the rental of rooms at the Scottsdale Howard Johnson. If they had exercised ordinary prudence as to the development, implementation, and enforcement of policies, procedures, and practices regarding standardized check-in protocol, payment methods, identification requirements, obtaining vehicle information, and monitoring visitors who are not registered hotel guests, then this sex trafficking activity would have been detected.

d. Wyndham retained control over and directly participated in the collection, tracking and analysis of guest data, property data, Wi-Fi data, and security data and retained sole ownership of all guest data. This data revealed "red flags" of sex trafficking. If Wyndham had exercised ordinary prudence as to the monitoring and analysis of this data, then this sex trafficking activity would have been detected.

**Scottsdale Inn Facilitated the Trafficking Activity at the Scottsdale Howard Johnson, Including the Trafficking of Jane Doe (D.H.).**

69.     Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Scottsdale Howard Johnson, Scottsdale Inn continued renting rooms to be used in sex trafficking, including the trafficking of Jane Doe (D.H.), and continued operating the Scottsdale Howard Johnson in a way that enabled and facilitated sex trafficking activity.

70.     Although Scottsdale Inn knew or should have known about the sex trafficking activity that resulted in Jane Doe (D.H.) being trafficked, Scottsdale Inn

**SECOND AMENDED COMPLAINT**

continued to rent hotel rooms for and to facilitate sex trafficking activity.

71.     Scottsdale Inn also facilitated widespread trafficking at the Scottsdale Howard Johnson, including the trafficking of Jane Doe (D.H.), in ways including:

    a. continuing to provide rooms, services, and assistance that facilitated sex trafficking despite the obvious "red flags" of the trafficking of Jane Doe (D.H.) and other victims;

    b. allowing johns who were not registered hotel guests to freely access the hotel without requiring identification or any other method of tracking;

    c. using inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to human trafficking;

    d. following a pattern or practice of failing to contact law enforcement despite obvious indicia of criminal activity, including sex trafficking, occurring on site;

    e. implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff;

    f. providing these traffickers with the cover of a legitimate business where they could operate without having to divert significant time and resources to avoid detection or interference by hotel staff.

72.     Scottsdale Inn's acts and omissions, which were motivated by a single-minded focus on profit-maximization, showed serious indifference to and callous disregard for the rights of sex trafficking victims, including Jane Doe (D.H.)

73.     Scottsdale Inn knew that sex trafficking causes immeasurable harm to victims and, nonetheless, knowingly or recklessly engaged in a longstanding pattern of conduct that generated revenue by facilitating that trafficking.

**Wyndham Facilitated the Trafficking Activity at the Scottsdale Howard Johnson,**

**Including the Trafficking of Jane Doe (D.H.).**

74. Wyndham participated directly in aspects of the operation of the Scottsdale Howard Johnson that influenced whether and to what extent trafficking occurred at the hotel, including but not limited to the trafficking of Jane Doe (D.H.), as follows:

    a. assuming joint responsibility with the franchisee for detecting and preventing sex trafficking at the hotel property;

    b. assuming or retaining control over and responsibility for adopting, monitoring, and enforcing policies and protocols requiring hotel staff to report suspected criminal or trafficking activity;

    c. assuming or retaining control over and responsibility for training hotel staff on detecting and responding to sex trafficking based upon the well understood "red flags" or signs of sex trafficking;

    d. assuming or retaining control over and responsibility for adopting, monitoring, and enforcing policies and protocols regarding detecting and responding to sex trafficking;

    e. employing field-based associates who work with hotels on trafficking issues;

    f. assessing or auditing hotel properties, specifically, for the purpose of evaluating whether safety and security measures related to trafficking are in place;

    g. establishing systems for hotel staff and guests to report security issues to franchisor;

    h. requiring franchisees to provide Wi-Fi/internet access to guests;

    i. mandating the specific tools and systems that franchisees must use to provide Wi-Fi/internet access to guests;

    j. setting policies and protocols regarding guest use of Wi-Fi/internet, filtering and site-blocking mechanisms deployed, and monitoring/tracking of guest usage;

    k. requiring franchisees to use a system to monitor and track housekeeping requests;

**SECOND AMENDED COMPLAINT**

l.  setting policies for when and how housekeeping services are provided;

m. collecting and monitoring data that shows patterns of use or non-use of housekeeping services;

n.  setting policies for when and how hotel staff can accept tips.

75.    Wyndham played a central role in renting rooms at the Scottsdale Howard Johnson by, among other things:

a.  controlling all details of the guest reservation, check-in, and payment processes through management and control over all systems used for those processes and adoption of detailed and specific policies governing the means and methods used for guest reservation, check-in, and payment processes;

b.  controlling, overseeing and enforcing policies and procedures regarding check-in, payment, and identity verification procedures, including whether cash and prepaid cards could be used and who had to show identification.

c.  requiring the franchisee to use the franchisor's centralized reservation system and preventing the franchisee from using any other system;

d.  reserving rooms and accept payments without requiring franchisee approval or involvement;

e.  controlling and restricting the ability of franchisee and staff to refuse or cancel a reservation.

f.  requiring the franchisee to use a software system operated and controlled by the franchisor for booking rooms and checking guests into rooms;

g.  requiring the franchisee to use a software system operated and controlled by the franchisor to process payments;

h.  requiring the franchisee to use a property-management system operated and controlled by the franchisor;

i.  requiring the franchisee to use a data-management system operated and controlled by the franchisor;

j.  ensuring that data related to each room reservation passes through systems

**SECOND AMENDED COMPLAINT**

owned, maintained, and managed by the franchisor;

k. exercising control over the price of rooms;

l. controlling all details of the customer loyalty program that the franchisee was required to implement;

m. setting detailed policies for the check-in process, including requirements for identification and payment methods;

n. collecting guest data, requiring franchisees to report guest data, and reviewing and analyzing guest data, including names, payment information, reservation history, internet browsing data, and other details associated with their stay;

o. assuming sole ownership over all guest information;

p. overseeing do not rent (DNR) lists for its branded properties.

76. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Scottsdale Howard Johnson, Wyndham continued renting rooms for use in sex trafficking, including the rooms used to sexually exploit Jane Doe (D.H.).

77. Policies purportedly enacted and enforced by Wyndham to identify signs of sex trafficking and stop it from occurring were not properly implemented and/or enforced at the Scottsdale Howard Johnson.

78. Upon information and belief, despite having actual or constructive knowledge of the ongoing sex trafficking at the Scottsdale Howard Johnson, including the activity that led to Jane Doe (D.H.)'s trafficking, Wyndham used retained control over and direct involvement in hotel operations to facilitate trafficking, including by:

a. adopting, maintaining, and enforcing policies and practices regarding guest identification in a way that facilitated trafficking by allowing traffickers, including Jane Doe (D.H.)'s trafficker, to secure rooms without providing their own identifying information;

31

**SECOND AMENDED COMPLAINT**

b. adopting, maintaining, and enforcing policies and practices regarding payment methods in a way that facilitated trafficking by allowing traffickers, including Jane Doe (D.H.)'s trafficker, to pay for rooms using non-traceable methods;

c. adopting and enforcing inadequate training methods for the franchisee and hotel staff in a way that led to widespread and ongoing trafficking at the hotel property;

d. adopting and enforcing inadequate policies and protocols regarding trafficking in a way that led to widespread and ongoing trafficking at the hotel property;

e. providing traffickers continued access to Franchisor-maintained wi-fi and internet systems despite having active or constructive knowledge this access was being used to facilitate their trafficking activities;

f. adopting inappropriate and inadequate practices for monitoring, supervising, and responding to issues regarding the conduct of Franchisee and hotel staff related to human trafficking at the Scottsdale Howard Johnson;

g. implicitly or explicitly encouraging franchisee to continue facilitating trafficking by continuing the same methods of operation at the hotel property despite obvious evidence that those methods were leading to widespread and ongoing sex trafficking.

79. The conduct of Wyndham in operating the Scottsdale Howard Johnson facilitated widespread sex trafficking at the hotel, including the trafficking activities that led to Jane Doe (D.H.)'s trafficking.

80. Although Wyndham knew or should have known that the Scottsdale Inn used its "boots on the ground" role at the Scottsdale Howard Johnson to facilitate sex trafficking, Wyndham facilitated, assisted, and supported Scottsdale Inn in continuing to do so. Wyndham had numerous tools and options available to respond to the ongoing facilitation of sex trafficking at the Scottsdale Howard Johnson, both through options for

32

disciplining and controlling Scottsdale Inn and through Wyndham's own ability to make relevant operational changes. Instead, Wyndham elected to continue lending the perceived legitimacy of its brand and its own direct operational involvement to a hotel that continued to operate in a way that facilitated widespread sex trafficking.

81.     Wyndham's acts and omissions, which were motivated by a single-minded focus on profit-maximization, showed serious indifference to and callous disregard for the rights of sex trafficking victims, including Jane Doe (D.H.).

82.     Wyndham knew that sex trafficking causes immeasurable harm to victims and, nonetheless, knowingly or recklessly engaged in a longstanding pattern of conduct that generated revenue by facilitating that trafficking.

**Each Defendant Knowingly Benefitted from Participating in Ventures that Facilitated Jane Doe D.H.'s Sex Trafficking.**

83.     Each of the Defendants knowingly received benefits from participating in the venture that facilitated Jane Doe (D.H.)'s trafficking at the Howard Johnson.

84.     Scottsdale Inn and Wyndham each benefited from use of the Scottsdale Howard Johnson for sex trafficking.

85.     Wyndham, as franchisor, generates substantial income from operations of hotels such as the Howard Johnson. In exchange for providing the services described above and more specifically delineated in the controlling franchise agreement, Wyndham received a share of the profits from room rentals collected by Defendant Scottsdale Inn at the Howard Johnson. The primary source of Wyndham's income is the franchising royalty

**SECOND AMENDED COMPLAINT**

fee, but Wyndham also profits from reservation fees, marketing fees, loyalty program fees, and other miscellaneous ancillary fees, as described in the franchise documents. The fees generated by Wyndham are primarily based on gross room rentals; therefore, Wyndham's profits increase with each room rental.

86.     Defendant Scottsdale Inn, as franchisee, profited from every stay by every patron at the Howard Johnson, both from room rentals and other hotel services.

87.     Therefore, at all material times, Wyndham and Scottsdale Inn received monetary payment for the rental of rooms at the Howard Johnson, including the rooms where Jane Doe (D.H.)was being trafficked.

88.     Wyndham also benefited from frequent use of the Scottsdale Howard Johnson for sex trafficking because this regular and routine use of the hotel increased the hotel occupancy rate, and an increase in the hotel occupancy rate resulted in several benefits for Wyndham, including that this assisted Wyndham in obtaining financing and helped them market franchising opportunities to potential franchisees.

89.     As more fully described above, Wyndham and Scottsdale Inn knowingly benefited from participating in a venture with sex traffickers who regularly operated at the Scottsdale Howard Johnson, including Jane Doe (D.H.)'s sex trafficker ("Venture 1").

90.     Both Wyndham and Scottsdale Inn participated in this venture through a continuous business relationship with these sex traffickers. The traffickers developed a continuous business relationship with the Scottsdale Howard Johnson, and both Wyndham and Scottsdale Inn participated in this ongoing business relationship through their

**SECOND AMENDED COMPLAINT**

respective roles (as further described above) in hotel operations. This continuous business relationship involved mutual pursuit of benefit. These Defendants generated revenue from renting the rooms to traffickers who, in turn, used the rooms to generate revenue from the illegal sex trafficking operation. This continuous business relationship developed as:

    a. Scottsdale Inn and Wyndham facilitated and enabled sex trafficking in the ways described above.

    b. Defendants allowed traffickers to take steps that would minimize their traceability to law enforcement, such as accepting cash payments and not requiring identification from appropriate parties.

    c. These traffickers developed an understanding that hotel policies and practices would minimize their risk of detection and traceability.

    d. These traffickers developed an understanding that hotel staff would turn a blind eye and thus were able to operate without diverting time and resources to avoiding inference by hotel staff.

    e. These traffickers repeatedly used this same hotel because of an understanding that it was a venue that would enable and facilitate their sex trafficking operation.

91. Scottsdale Inn participated in the continuous business relationship with these traffickers through their direct "boots on the ground" role at the Scottsdale Howard Johnson. As further described above, Wyndham directly participated in this business relationship through its central role in room reservations and through its intimate involvement in aspects of hotel operations related to the detection of and response to sex trafficking.

92. This continuous business relationship facilitated, assisted, and supported the

**SECOND AMENDED COMPLAINT**

traffickers' illegal sex trafficking activities, including their trafficking of Jane Doe (D.H.). Wyndham and Scottsdale Inn did not only provide a physical space (harboring) but also the cover of a legitimate business as a venue where they could profit from sexual exploitation without significant risk of disruption by hotel staff and with minimal risk of detection and traceability. Wyndham and Scottsdale Inn also allowed johns who were not registered hotel guests to come and go freely without any need to identify themselves. This helped the traffickers to attract business from sex buyers and to minimize risks of detection and traceability. The conduct of both the Scottsdale Inn and Wyndham facilitated trafficking at the Scottsdale Howard Johnson.

93.    Wyndham and Scottsdale Inn knew or should have known that Venture 1 was engaged in violations of the TVPRA because victims were being harbored, maintained, provided, and exploited at the Scottsdale Howard Johnson by traffickers including Jane Doe (D.H.)'s trafficker.

94.    In ways described more fully above, Wyndham and Scottsdale Inn also knowingly benefited from participating together in a hotel-operating venture at the Scottsdale Howard Johnson that facilitated widespread sex trafficking, including the trafficking of Jane Doe (D.H.) (hereinafter "Venture 2").

95.    Venture 2 is a commercial venture that resulted from a longstanding business relationship between Scottsdale Inn and Wyndham that centered on operation of the Scottsdale Howard Johnson. This undertaking involved shared goals of maximizing gross room revenue and increasing room occupancy rates.

**SECOND AMENDED COMPLAINT**

96.     Scottsdale Inn Franchise and Wyndham each participated in Venture 2 through their respective roles in hotel operations as further described above. Each of these Defendants was directly involved in aspects of operations that facilitated sex trafficking at the hotel and continued to operate the hotel in the same manner despite actual or constructive knowledge that this was facilitating sex trafficking.

97.     There were TVPRA violations within the scope of Venture 2 because the hotel at the center of the venture, the Scottsdale Howard Johnson, was used to harbor, maintain, provide, and exploit many trafficking victims, including multiple victims of Jane Doe (D.H.)'s trafficker and Jane Doe (D.H.) herself. There were also TVPRA violations with the scope of Venture 2 through Scottsdale Inn's violations of 18 U.S.C. §1591(a) as a perpetrator.

98.     Both Scottsdale Inn and Wyndham knew or should have known that there were TVPRA violations within the scope of Venture 2 based on the obvious "red flags" associated with the trafficking activities at the Scottsdale Howard Johnson.

99.     Wyndham also knew or should have known that there were TVPRA violations within the scope of Venture 2 based on the role of Scottsdale Inn in facilitating widespread sex trafficking, including by Jane Doe (D.H.)'s trafficker as further described above. Despite this, Wyndham continued to assist and facilitate these violations through ongoing participation in this commercial venture with Scottsdale Inn.

**Scottsdale Inn and the Staff at the Scottsdale Howard Johnson Acted as Actual Agents of Wyndham.**

**SECOND AMENDED COMPLAINT**

**100.** Wyndham is vicariously liable for the acts, omissions, and knowledge of Scottsdale Inn and hotel staff, which acted as Wyndham's actual agents or subagents when operating the Scottsdale Howard Johnson.

**101.** Wyndham subjected and retained the right to subject the Scottsdale Inn to detailed requirements regarding the operation of the Scottsdale Howard Johnson. These detailed requirements came from written agreements, manuals, policies, protocols, directives, and mandates that Wyndham imposed through its ongoing control of hotel operations.

**102.** Wyndham obscures the full extent of control it exercises over the Scottsdale Inn by treating these manual, policies, and directives as confidential and proprietary and guarding against public disclosure. Upon information and belief, the requirements that that Wyndham imposed on the Scottsdale Inn:

a. Wyndham required franchisees and management of franchised hotels to participate in mandatory training programs, both during onboarding and on an ongoing basis. This training covered all aspects of hotel operations, including aspects of hotel operations that go significantly beyond what would be necessary for Wyndham to protect its registered trademarks;

b. Wyndham maintained a team of regionally based trainers to provide training at branded hotels. Wyndham provided training for hotel management and select hotel staff on-site and at locations selected by Wyndham;

c. Wyndham provided hotels staff with training it created through an online learning platform, Wyndham University, it controlled and maintained, including training specific to hotel-based jobs, such as safety and security training for housekeeping staff and safety and security training for the front desk;

d. Wyndham controlled training provided by franchisees to hotel staff by dictating the content of that training, providing required content for that training, and dictating the training methods used;

**SECOND AMENDED COMPLAINT**

e.  Wyndham retained sole discretion to determine whether all training had been completed satisfactorily;

f.  Wyndham participated in the hiring, disciplining, and terminating hotel management and employees;

g.  Wyndham required franchisees to participate in mandatory centralized services for day-to-day operation of the hotel;

h.  For certain products and services that franchisee was required to purchase to operate the property, Wyndham designated approved vendors and prohibited franchisee from purchasing goods and services from anyone other than an approved vendor;

i.  Wyndham required franchisees to use its revenue management system, through which it dictated pricing and strategies to maximize revenue, and which gave it direct ability to supervise day-to-day operations of the hotel through direct access to the system;

j.  Wyndham set and controlled room rates and discounts;

k.  Wyndham set required staffing levels for the Scottsdale Howard Johnson;

l.  Wyndham established detailed job descriptions for all positions in its branded properties and drafted numerous, detailed policies that referenced these positions and dictated which positions must perform which tasks and how they must do so;

m. Wyndham set requirements for and participated in the hiring process used by franchisees and oversaw and participated in employee discipline processes and termination decisions;

n.  Wyndham participated in setting employee wages and salaries for hotel staff;

o.  Wyndham exercised control over paid time off, flexible scheduling, employee discounts, and employee benefits for hotel staff;

p.  Wyndham controlled channels for guests to report complaints or provide feedback regarding the Scottsdale Howard Johnson and directly participated in the response and/or supervised and the response to customer complaints or other feedback. Wyndham retained the right to provide refunds or other compensation to guests and to require Scottsdale Inn to pay associated costs;

39

**SECOND AMENDED COMPLAINT**

q. Wyndham generated reports and analysis of guest complaints and online reviews for the Scottsdale Howard Johnson;

r. Wyndham set detailed requirements for insurance that Scottsdale Inn must purchase;

s. Wyndham exercised or retained control over Scottsdale Inn's day-to-day accounting and banking practices;

t. Wyndham regularly audited the books and records of Scottsdale Inn;

u. Wyndham conducted frequent and unscheduled inspections of the Scottsdale Howard Johnson;

v. Wyndham retained the right to issue fines, require additional training, to impose and supervise implementation of detailed corrective action plans, and to take other steps up to and including termination of the franchising agreement if franchisee violated any of Wyndham' detailed rules, expectations, protocols, or policies, including those that governed day-to-day operations of the Scottsdale Howard Johnson;

w. Wyndham controlled all marketing for the Scottsdale Howard Johnson, directly provided marketing services, and prohibited Scottsdale Inn from maintaining any online presence unless specifically reviewed and approved by Wyndham;

x. Wyndham exercised or retained control over all aspects of building and facility design;

y. Wyndham imposed detailed recordkeeping and reporting requirements on Scottsdale Inn regarding virtually all aspects of hotel operations;

z. Wyndham supervised and controlled day-to-day operations of the Scottsdale Howard Johnson through detailed information and extensive reports that it obtained through the property management system and other software systems it required Scottsdale Inn to use;

aa. Wyndham required the franchisee and hotel staff to implement a data system that gives Franchisor real-time information that it can monitor on a day-to-day basis; and

bb. Wyndham retained the virtually unlimited right to revise policies or adopt

40

new requirements for the day-to-day aspects of hotel operations.

103. As further described above, Wyndham specifically retained and exercised control over the aspects of hotel operations at the Scottsdale Howard Johnson that caused or contributed to Jane Doe (D.H.)'s harm, including but not limited to: reservations of rooms, relevant policies (including payment method accepted, identification requirements, and hotel access for individuals who are not registered hotel guests) hotel security, employee training, guest and hotel staff reporting of security issues, and detection of and response to suspected sex trafficking. Wyndham had the right to exercise detailed, day-to-day control over and involvement in these areas. They also regularly and closely monitored these areas.

104. Wyndham had the right to and did enforce control over Scottsdale Inn through various methods, including:

    a. the right to conduct detailed inspections of the Scottsdale Howard Johnson;

    b. monitoring or auditing the Scottsdale Inn for compliance with policies and expectations;

    c. directing Scottsdale Inn to take specific steps to come into compliance with detailed and exacting standards regarding day-to-day operations;

    d. mandating training and education for franchisees and/or hotel staff;

    e. employing consultants or field agents to become involved in the day-to-day operations of franchised hotels;

    f. the right to impose fines or penalties;

    g. the right to impose additional conditions on franchisee or to restrict or limit its right to provide goods and services; and

41

**SECOND AMENDED COMPLAINT**

h. the right to terminate the franchise agreement for failure to comply with policies that govern the means and methods used for day-to-day operations.

### CAUSE OF ACTION—SEX TRAFFICKING UNDER THE TVPRA

**105.** Jane Doe (D.H.) incorporates all other allegations.

**Cause of Action: Perpetrator liability under 18 U.S.C. §1595(a) based on violation of 18 U.S.C. §1591(a) (Scottsdale Inn)**

**106.** Jane Doe (D.H.) is a victim of sex trafficking within the meaning of § 1591 and 1595(a) and is thus entitled to bring a civil action under 18 U.S.C. §1595(a) against the "perpetrator" of any violation of the TVPRA.

**107.** Scottsdale Inn is a perpetrator within the meaning of 18 U.S.C. §1595(a) because it :

- knew about or was willfully blind to the activity leading to Jane Doe (D.H.)'s trafficking because it directly observed the obvious "red flags" of this trafficking activity;

- violated 18 U.S.C. §1591(a)(1) when, through the acts and omissions described throughout this Complaint, it harbored individuals (including Jane Doe (D.H.)) knowing or in reckless disregard of the fact that the victims would be caused, through force, coercion, or fraud, to engage in commercial sex acts while at their respective hotel properties.

- violated 18 U.S.C. §1591(a)(2) when, through the acts and omissions described throughout this Complaint, they knowingly received financial benefit by knowingly assisting, supporting, or facilitating a venture that trafficked victims including Jane Doe (D.H.).

**Cause of Action: Beneficiary Liability under §1595 (a) of the TVPRA (all Defendants).**

**108.** Jane Doe (D.H.) is a victim of sex trafficking within the meaning of 18 U.S.C. §§ 1591 and 1595(a) and is thus entitled to bring a civil action under the

**SECOND AMENDED COMPLAINT**

"beneficiary" theory in 18 U.S.C. §1595(a) against anyone who knowingly benefited from participation in a venture that the person knew or should have, with reasonable diligence, known was engaged in a violation of the TVPRA. Jane Doe (D.H.) is a victim of sex trafficking under 18 U.S.C. §§ 1591 and 1595(a) and is thus entitled to bring a civil action against any beneficiary who knowingly benefited from participation in a venture that the beneficiary knew or should have, with reasonable diligence, known was engaged in a violation of the TVPRA.

109. All Defendants are liable as beneficiaries under 18 U.S.C. § 1595(a).

110. **Venture 1:** Through acts and omissions more fully described throughout this Second Amended Complaint, Wyndham and Scottsdale Inn received a financial benefit from participating in a venture with Jane Doe (D.H.)'s sex trafficker and other traffickers who regularly operated at the Scottsdale Howard Johnson.

    a. Venture 1 resulted from the development of a continuous business relationship between these traffickers and the Scottsdale Howard Johnson, which formed when Wyndham and Scottsdale Inn continued renting hotel rooms despite the obvious "red flags" of their sex trafficking activity and created an environment at the Scottsdale Howard Johnson that facilitated their trafficking activities.

    b. Wyndham and Scottsdale Inn each directly participated in this ongoing business relationship through their respective roles in hotel operations—and specifically those aspects of operations that facilitated sex trafficking—as described above. Through their participation, Wyndham and Scottsdale Inn facilitated and supported the activities of the sex trafficker of Jane Doe (D.H.) and other traffickers at the Scottsdale Howard Johnson.

    c. Wyndham and Scottsdale Inn benefited from this their participation in this venture because they received increased revenue and other benefits described above when rooms at the Scottsdale Howard Johnson were rented for use in trafficking, including the trafficking of Jane Doe (D.H.).

**SECOND AMENDED COMPLAINT**

d. This venture violated the TVPRA through the conduct of the traffickers who repeatedly harbored, maintained, provided, and exploited victims, including Jane Doe (D.H.), at the Scottsdale Howard Johnson.

e. Wyndham and Scottsdale Inn knew or should have known that Venture 1 was engaged in violations of the TVPRA based on the "red flags" associated with trafficking at the Scottsdale Howard Johnson and because this trafficking would have been detected if they had exercised ordinary prudence.

111. **Venture 2**: Through the acts and omissions more fully described above, Wyndham and Scottsdale Inn also participated together in a commercial hotel-operating venture that facilitated widespread sex trafficking at the Scottsdale Howard Johnson:

a. Venture 2 is a commercial venture that resulted from the business relationship between Wyndham and Scottsdale Inn operating the Scottsdale Howard Johnson for the mutual purpose of maximizing revenue, including gross room revenue.

b. Scottsdale Inn participated in this venture by using its on-the-ground role to operate the Scottsdale Howard Johnson in a way that it knew or should have known was facilitating sex trafficking.

c. Wyndham participated in this venture by (1) continuing the ongoing business relationship with Scottsdale Inn despite actual or constructive knowledge the hotel was facilitating sex trafficking; (2) directly involving itself in and supporting aspects of hotel operations that they knew or should have known were facilitating trafficking at the hotel in ways described above; and (3) continuing to lend the perceived legitimacy of its brand and provide marketing services for the hotel after they knew or should have known the venture was engaged in violations of the TVPRA.

d. Wyndham and Scottsdale Inn each benefited from participating in Venture 2 as each derived revenue and other benefits from each room rented to a sex trafficker, including the rooms rented to the trafficker of Jane Doe (D.H.).

e. Venture 2 violated the TVPRA through the widespread sex trafficking that occurred at the Scottsdale Howard Johnson as victims—including Jane Doe (D.H.)—were harbored, maintained, provided, and exploited at the Scottsdale Howard Johnson. This venture also violated the TVPRA through the conduct of Franchisees, who violated 18 U.S.C. §1591(a) as perpetrators.

f. Wyndham and Scottsdale Inn knew or should have known that this hotel-

44

**SECOND AMENDED COMPLAINT**

operating venture was facilitating sex trafficking, including the activities of the trafficker of Jane Doe (D.H.).

**Cause of Action: Vicarious Liability for TVPRA Violations (Wyndham).**

112.    Wyndham is vicariously liable for the TVPRA violations of the Scottsdale Inn and hotel staff, who acted as Wyndham' actual agents.

113.    An agency relationship existed between Wyndham and Scottsdale Inn because, through the acts and omissions described more fully above, Wyndham exercised and retained the right to exercise pervasive control over Scottsdale Inn and their operation of the Scottsdale Howard Johnson, including the means and methods they used and their day-to-day operations of the hotel.

114.    An agency relationship also existed between Wyndham and Scottsdale Inn because Wyndham retained and exercised control over the specific aspects of operations that caused Jane Doe (D.H.)'s harm as described above.

115.    Scottsdale Inn committed TVPRA violations—as both beneficiaries and perpetrators—within the scope of its agency relationship with Wyndham. Specifically, it committed these violations while renting rooms at the hotel and operating the hotel in a manner that facilitated sex trafficking.

116.    Jane Doe (D.H.) further alleges that Wyndham is vicariously liable for the acts and omissions of the staff at the Scottsdale Howard Johnson as a joint employer. In the ways described throughout this Second Amended Complaint, Wyndham jointly controlled the terms and conditions of their employment. As a result, Wyndham and Scottsdale Inn are the joint employers of the hotel staff.

45

**SECOND AMENDED COMPLAINT**

## DAMAGES

**117.** Defendants' acts and omissions, individually and collectively, caused Jane Doe (D.H.) to sustain legal damages.

**118.** Defendants are joint and severally liable for all past and future damages sustained by Jane Doe (D.H.)

**119.** Jane Doe (D.H.) is entitled to be compensated for personal injuries and economic damages, including:

  A. Actual damages (until trial and in the future);

  B. Incidental and consequential damages (until trial and in the future);

  C. Mental anguish and emotional distress damages (until trial and in the future);

  D. Lost earnings and lost earning capacity (until trial and in the future);

  E. Necessary medical expenses (until trial and in the future);

  F. Life care expenses (until trial and in the future);

  G. Physical pain and suffering (until trial and in the future);

  H. Physical impairment (until trial and in the future);

  I. Exemplary/Punitive damages;

  J. Attorneys' fees; and

  K. Costs of this action.

  L. Pre-judgment and all other interest recoverable.

## TOLLING OF LIMITATIONS

**120.** To the extent Defendants assert an affirmative defense of limitations, Jane

**SECOND AMENDED COMPLAINT**

Doe (D.H.) invokes the discovery rule. At the time she was harmed and through at least 2014, Jane Doe (D.H.) was under the coercion and control of a trafficker who beat her, threatened her, and manipulated her. As a result, Jane Doe (D.H.) lacked the information and capacity to understand her injuries and their legal causes.

121.    Thus, Jane Doe (D.H.) did not discover and could not reasonably have discovered the legal cause of her injury more than ten years before she filed this lawsuit. While she was under the control of her trafficker, Jane Doe (D.H.)—through no fault of her own—lacked the information and understanding to bring a claim because she did not know both her injury and the cause of her injury. This lack of information was a direct result of Jane Doe (D.H.) being kept under the control, coercion, and manipulation of her trafficker, which Defendants facilitated.

122.    To the extent Defendants assert an affirmative defense of limitations, Jane Doe (D.H.) invokes the doctrine of equitable tolling because, as a result of being a victim of trafficking, Jane Doe (D.H.) faced extraordinary circumstances, which arose through no fault of her own, that prevented her from filing a lawsuit, and those circumstances did not end more than 10 years before Jane Doe (D.H.) filed this lawsuit.

123.    While under the control of her trafficker through at least 2014, Jane Doe (D.H.) did not have the freedom to investigate her claims, to identify those responsible, or to seek legal representation necessary to pursue her legal rights. Jane Doe (D.H.) could not have pursued her claims while under the active control of her trafficker despite the exercise of ordinary diligence.

47

**SECOND AMENDED COMPLAINT**

**124.** To the extent Defendants assert an affirmative defense of limitations, Jane Doe (D.H.) also invokes the continuing violation doctrine because this lawsuit arises out of a pattern of continuous and ongoing tortious conduct by Defendants, individually and in concert.

**125.** Jane Doe (D.H.) was subject to continuous trafficking at the Scottsdale Howard Johnson through at least 2013. Her trafficking at this hotel did not end more than 10 years before Jane Doe (D.H.) filed this lawsuit.

**126.** This continuous trafficking resulted from Defendants' facilitation of trafficking at the Scottsdale Howard Johnson and Defendants' ongoing ventures with one another and with criminal traffickers at that hotel.

## JURY TRIAL

**127.** Jane Doe (D.H.) demands a jury trial on all issues.

## RELIEF SOUGHT

**128.** Wherefore, Jane Doe (D.H.) respectfully requests judgment against Wyndham, Scottsdale Inn, LLC, PRC Investment LLC, and Parimal Parmar, jointly and severally, for actual damages in excess of the minimum jurisdictional limits of this Court, pre- and post-judgment interest as allowed by law, costs of suit, attorney fees, and all other relief, at law or in equity, to which she may be justly entitled.

Respectfully submitted,

**Richard J. Harris Law, PC**
By:___/s/_____
Richard J. Harris (SBN  013859)
*rjharrislaw@gmail.com*
4000 Hickory Fairway Dr.

Woodstock, GA 30188
Telephone: 480-708-9111

**PROVOST ✶ UMPHREY LAW FIRM**
Edward Fisher (PHV g)
State Bar No.: 24012624
350 Pine Street, Suite 1100
Beaumont, Texas 77701
Telephone: (409) 838-8813
efisher@pulf.com
        and
Patrick Barrett (PHV)
Texas Bar No.: 00787042
4205 Hillsboro Pike, Suite 303
Nashville, TN 37215
615-463-4000
pbarrett@pulf.com

        and
Bryan O. Blevins, Jr. (PHV)
Texas Bar No.: 02487300
350 Pine Street, Suite 1100
Beaumont, Texas 77701
(409) 835-8858
bblevins@pulf.com

*Attorneys for Plaintiff*

**SECOND AMENDED COMPLAINT**