**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jane Doe DH, | No. CV-23-00759-PHX-JJT |
| Plaintiff, | **ORDER** |
| v. | |
| Scottsdale Inns LLC, *et al.*, | |
| Defendants. | |

The Court now resolves multiple pending motions, including Defendant Wyndham Hotels & Resorts, Incorporated's Motion for Summary Judgment (Doc. 120) and Defendant Scottsdale Inn LLC's Motion for Summary Judgment (Doc. 124), motions to exclude Plaintiff Jane Doe DH's two experts (Docs. 141, 144), and motion for sanctions related to Plaintiff's purportedly late disclosures (Doc. 143). These motions have been fully briefed, and the Court finds it appropriate to resolve them without oral argument. LRCiv 7.2(f). As an administrative matter, the Court will direct the Clerk of Court to file under seal the documents both parties lodged in compliance with the Court's earlier order dated October 2, 2025. (*See* Docs. 145, 154, 156, 158, 162, and 163.)

I.     BACKGROUND[1]

The following facts are undisputed and taken from Wyndham's Statement of Facts (Doc. 149 at 1–9, "SOF I"), Plaintiff's responsive statement to Wyndham's Statement of Facts (Doc. 161 at 1–7, "CSOF I") and additional material facts (Doc. 161 at 7–33, "ASOF

[1] The Court references document page numbers as generated by the Electronic Case Filing system for all record citations herein.

I"), Scottsdale Inn's Statement of Facts (Doc. 142 at 1–9, "SOF II"), Plaintiff's responsive statement to Scottsdale Inn's Statement of Facts (Doc. 157 at 1–7, "CSOF II") and additional material facts (Doc. 157 at 8–22, "ASOF II").

Scottsdale Inn[2] is a franchisee of Howard Johnson International, Inc ("HJI"), which is the franchisor of the Howard Johnson brand and not a party to this suit. (SOF I ¶¶ 3, 35; CSOF I ¶¶ 3, 35.) Wyndham is the parent company of HJI. (SOF I ¶ 3; CSOF I ¶ 3.) Scottsdale Inn managed the "Howard Johnson" hotel located on East Indian School Road in Scottsdale, Arizona (the "Hotel"), which opened in March 2012. (SOF II ¶¶ 1–5; CSOF II ¶¶ 1–5.) The Hotel had exterior-facing rooms, a lobby and a parking area. (SOF II ¶¶ 27–28; CSOF II ¶¶ 27–28.) It was common for guests to hang out in the parking area or invite visitors to the Hotel. (SOF II ¶ 32; CSOF II ¶ 32.) To enter the Hotel property by car, guests and visitors would drive through a singular entrance to the parking area that passed the lobby. (SOF II ¶ 29; CSOF II ¶ 29.) Visitors were not required to check in with lobby staff. (SOF II ¶ 33; CSOF II ¶ 33.) During the relevant period, Ms. Kristy Lewis was the general manager of the Hotel and a total of 12 employees worked there. (SOF II ¶ 34; CSOF II ¶ 34.) None of the Hotel staff received training about the signs of sex-trafficking. (*See* ASOF II ¶¶ 80–90.)

Plaintiff was lured into the commercial sex industry at sixteen years old by an older man named "J." (SOF II ¶ 7; CSOF II ¶ 7.) She was first trafficked in California where she lived out of hotels with J. and other girls. (SOF II ¶ 10; CSOF II ¶ 10.) She was later trafficked to Arizona, and she claims that she stayed in the Hotel between February 2013 and August 2013 five or six times. (SOF I ¶ 9; CSOF ¶ 9; SOF II ¶¶ 1, 39; CSOF II ¶¶ 1, 39.)

During her stays at the Hotel, Plaintiff would check in alone, provide her government ID, and pay for a single room with cash or prepaid card. (SOF II ¶ 41; CSOF II ¶ 41.) Only once did Plaintiff check in with another woman who also worked with J., but J. was never present. (SOF I ¶ 12; CSOF ¶ 12; SOF II ¶¶ 42–43; CSOF II ¶¶ 42–43.) Those

---

[2] PRC Investment LLC and Parimal Parmar are members of Scottsdale Inn (SOF ¶ 4; CSOF ¶ 4), but Plaintiff voluntarily dismissed her claims against them (Doc. 152).

who booked a meeting with Plaintiff, the "johns," would receive her hotel room number directly from Plaintiff via text message. (SOF II ¶¶ 46–47; CSOF II ¶¶ 46–47.) Plaintiff's meetings occurred only in the privacy of the hotel room. (SOF II ¶ 48; CSOF II ¶ 48.) Plaintiff did not inform or otherwise indicate to staff that she was being trafficked or needed help. (SOF I ¶ 29; CSOF I ¶ 29; SOF II ¶¶ 53–54; CSOF II ¶¶ 53–54.) Instead, she stayed in the hotel room except when she was extending her stay another night with lobby staff or getting food or supplies. (SOF I ¶ 15; CSOF I ¶ 5; SOF II ¶¶ 14, 52; CSOF II ¶¶ 14, 52.) Plaintiff kept the "Do Not Disturb" signage on the door of the hotel room and exchanged towels and trash with staff at the door. (SOF I ¶15; CSOF I ¶ 15; SOF II ¶ 16; CSOF II ¶ 16.) Staff were "sometimes" let into the room by Plaintiff, where she kept lubricants, condoms, baby wipes, candles and air fresheners. (SOF II ¶ 17; CSOF II ¶ 17.)

On July 24, 2013, police officers conducted a "sting" operation at the Hotel after discovering Plaintiff's online advertisements. (SOF I ¶¶ 23–25; CSOF I ¶¶ 23–25; SOF II ¶ 50; CSOF II ¶ 50.) Aside from this one sting operation, there is no evidence that any other prostitution or sex trafficking arrest was made at the Hotel, and Plaintiff herself observed no other prostitute or sex trafficking victim at the Hotel while she was there. (SOF II ¶¶ 58–59; CSOF II ¶¶ 58–59.) Ms. Lewis also recalled no police investigations or calls to the Hotel regarding prostitution or sex trafficking. (SOF II ¶ 36; CSOF II ¶ 36.)

Fortunately, Plaintiff eventually escaped her association with J. (ASOF I ¶ 24; SOF II ¶ 26; CSOF II ¶ 26.) On May 3, 2023, nearly ten years after her last stay at the Hotel, Plaintiff sued Scottsdale Inn and Wyndham under the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1595(a) ("TVPRA"). Scottsdale Inn and Wyndham now move for summary judgment (Doc. 120, Mot. I (Wyndham's motion); Doc. 124, Mot. II (Scottsdale Inn's motion), to which Plaintiff has responded (Doc. 159, Resp. I; Doc. 155, Resp. II), and Scottsdale Inn and Wyndham both replied (Doc. 169, Reply I (Wyndham's reply); Doc. 171, Reply II (Scottsdale Inn's reply)).

. . .

. . .

- 3 -

## II.     LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriate when the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to prevail as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "A fact is 'material' only if it might affect the outcome of the case, and a dispute is 'genuine' only if a reasonable trier of fact could resolve the issue in the non-movant's favor." *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011). "The Court need not 'comb the record' looking for other evidence; it is only required to consider evidence set forth in the moving and opposing papers and the portions of the record cited therein." *New Leaf Publ'g, Inc. v. Top Innovations LLC*, No. 2:24-cv-04676-MEMF-SSC, 2025 U.S. Dist. LEXIS 208363, at *5 (C.D. Cal. Oct. 21, 2025) (citing Fed. R. Civ. P. 56(c)(3), (e)(2); *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001)).

As the moving party, Defendant "bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 232. When, as here, the moving party does not bear the ultimate burden of proof, Defendant "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). If the moving party does so, the nonmoving party must produce evidence to support its claim or defense. *Id.* at 1103. Summary judgment is appropriate against a party that "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

- 4 -

In considering a motion for summary judgment, the court must regard as true the nonmoving party's evidence if it is supported by affidavits or other evidentiary material.[3] *Anderson*, 477 U.S. at 255. The nonmoving party may not merely rest on its pleadings; it must produce some significant probative evidence tending to contradict the moving party's allegations, thereby creating a material question of fact. *Id.* at 256–57 (holding that the plaintiff must present affirmative evidence to defeat a properly supported motion for summary judgment); *see also Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) ("A summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data.") (citation modified). "A mere scintilla of evidence will not do, for a jury is permitted to draw only those inferences of which the evidence is reasonably susceptible; it may not resort to speculation." *Brit. Airways Bd. v. Boeing Co.*, 585 F.2d 946, 952 (9th Cir. 1978).

## III.    ANALYSIS

### A.    Evidentiary Objections and Motions to Exclude Plaintiff's Evidence

Scottsdale Inn objects to Plaintiff's eleventh exhibit to her responsive brief that, according to Scottsdale Inn, was untimely disclosed on the last day of fact discovery. (Reply II at 2), and moves for sanctions related to that untimely disclosure (*see* Doc. 143). Scottsdale Inn also moves to preclude the testimony of Plaintiff's two expert witnesses, Mr. Robert Cotto and Ms. Rochelle Keyhan (Docs. 141, 144).

Without deciding whether Mr. Cotto and Ms. Keyhan's testimony and reports are admissible or whether the disclosure of the emails now used as Plaintiff's eleventh exhibit were untimely, the Court will consider that evidence for the purpose of resolving Scottsdale Inn's summary judgment motion. It will also consider the portion of Plaintiff's statement of facts that she submitted in response to each summary judgment motion notwithstanding Scottsdale Inn's objections to many of those facts as duplicative, immaterial, or

---

[3] For the purpose of resolving Scottsdale Inn's summary judgment motion, the Court will consider all evidence attached to Plaintiff's responsive brief to which Scottsdale Inn objects and moves to exclude, including the expert reports (Docs. 155-7, 155-8) and emails showing transactions with "Howard Johnson" between April 18, 2013 and May 7, 2013 (Doc. 155-11).

inadmissible (Reply II at 5) and Wyndham's objection that the statement exceed the 10-page limit set by this Court (Reply I at 1–2).

### B.      Beneficiary Theory of Liability

Under the TVPRA, "an individual who is a victim of [the TVPRA] may bring a civil action against . . . whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of [the TVPRA])," known as beneficiary or participant liability. 18 U.S.C. § 1595(a); *Ratha v. Phatthana Seafood Co.*, 35 F.4th 1159, 1175 (9th Cir. 2022) ("*Ratha I*").

After voluntarily dismissing her claims against PRC Investments LLC and Parimal Parmar (Doc. 152) and abandoning the perpetrator theory of liability against Scottsdale Inn (Resp. II, at 2 n.1), what remains of this matter is Plaintiff's § 1595(a) beneficiary liability claims against Scottsdale Inn and Wyndham, and vicarious liability claim against Wyndham as the parent company of Scottsdale Inn's franchisor. As a threshold matter, neither Defendant appears to challenge that Plaintiff was a victim of sex-trafficking under § 1591 (Mot. II at 2 n.1; *see generally* Mot. I) or that they knowingly benefited from a venture[4] (*see* Mot. II at 12; *see generally* Mot. I). The Court will first address Plaintiff's beneficiary liability claim against Scottsdale Inn, then turn to the remaining claims against Wyndham.

####     1.      *Scottsdale Inn*

Scottsdale Inn argues that Plaintiff fails to meet the second and third element of § 1595(a) because there is no evidence that it engaged in a commercial venture with Plaintiff's trafficker, J. (Mot. II at 13.)  Plaintiff concedes that J. was not directly involved in any transaction with Scottsdale Inn and that he was never present at the Hotel. (*See* CSOF II ¶¶ 41–43.) She instead argues that Scottsdale Inn participated in a commercial

---

[4] Even if they had, district courts in this Circuit find that the rental of hotel rooms is sufficient to meet this element. *A.B. v. Hilton Worldwide Holdings Inc.*, 484 F. Supp. 3d 921, 936 (D. Or. 2020) ("The 'knowingly benefits financially' element of § 1595 'merely requires that Defendant knowingly receive a financial benefit' and the rental of a hotel room—or royalties from that rental—constitutes a financial benefit sufficient to meet this element.").

venture by renting her hotel rooms, providing her Wi-Fi that she used to post online advertisements, delivering extra towels to her door, allowing unregistered visitors to access the Hotel, and failing to have security measures at the Hotel. (Resp. II at 7.) Scottsdale Inn replies that a "participation in a venture" requires that it "engaged with [J.] directly" or "had a continuous business relationship with [J.] that either established a pattern of conduct or constituted a tacit agreement to facilitate his alleged trafficking of Plaintiff." (Reply II at 8.)

The TVPRA does not define the terms used in § 1595(a), and absent a statutory definition, many courts have defined it by attributing "participation" and "venture" their ordinary meanings. *Doe (K.R.D.) v. Hilton Worldwide Holdings Inc.*, 798 F. Supp. 3d 1082, 1093 (N.D. Cal. 2025). Of the reported Ninth Circuit cases that reference beneficiary liability arising under § 1595(a), only one goes so far as to define "participation" as "to take part," but it did not define "venture." *Ratha v. Rubicon Res., LLC*, 168 F.4th 541, 560 (9th Cir. 2026) ("*Ratha II*"). No judges in this District have taken up this issue of defining or applying "participation in a venture" under § 1595(a), and other district courts in this Circuit and across the country vary in the standards they apply.

To understand these variances, the Court begins by reviewing a case that is among the first and most widely cited on the matter. In *M.A. v. Wyndham Hotels & Resorts, Inc.*, the district court of the Southern District of Ohio determined that "participation in a venture" does not require actual knowledge of participation in the sex trafficking itself, and that, "[i]n the absence of a direct association, Plaintiff must allege at least a showing of a continuous business relationship between the trafficker and the hotels such that it would appear that the trafficker and the hotels have established a pattern of conduct or could be said to have a tacit agreement." 425 F. Supp. 3d 959, 970 (S.D. Ohio 2019) ("*M.A. I*") (finding allegations that a hotel rented rooms to people it knew or should have known engaged in sex trafficking is sufficient to meet "participation in a venture").

The Eleventh Circuit took a different approach. In *Doe v. Red Roof Inns, Inc.*, it defined "venture" as "a common undertaking or enterprise involving risk and potential

profit." 21 F.4th 714, 725 (11th Cir. 2021). This definition requires that a defendant hotel does more than merely observe signs of sex-trafficking because "observing something is not the same as participating in it." *Id*. at 727. The Eleventh Circuit recently affirmed this standard, holding that "[m]erely renting a hotel room to a trafficker with actual or constructive knowledge of his trafficking does not constitute 'participation in a venture' as defined by *Red Roof*." *A.G. v. Northbrook Indus., Inc.*, 171 F.4th 1257, 1269 (11th Cir. 2026). "To be liable under § 1595, defendants must take part in a common enterprise to the extent that they share legal risks and potential profits with traffickers." *Id*. at 1268. The Eleventh Circuit expressly rejected the "continuous business relationship" approach developed in *M.A. I*, holding that "something more than engaging in an ordinary buyer-seller transaction is required.'" *Id*. at 1269.

In a later opinion, the same district court that decided *M.A. I* reviewed the Eleventh Circuit's standard and expressly rejected it, noting that that circuit's understanding of "participation" would require "at a minimum, 'some form of evidence of a defendant's actual knowledge of a plaintiff's presence on the property, plus some overt act to establish the defendant's participation to survive summary judgment.'" *M.A. v. Wyndham Hotels &, Resorts, Inc.*, No. 2:19-CV-00849, 2025 WL 2696500, at *17 (S.D. Ohio Sept. 22, 2025) ("*M.A. II*") (citation modified). There, district court determined that, "[t]o require the kind of blatant, proactive acts . . . that suffice in the Eleventh Circuit, would be to discard the "should have known" language in Section 1595." *Id.* at *18. The district court affirmed its prior standard developed in *M.A. I*, holding that a plaintiff can establish "participation in a venture" "through evidence of a direct association between the trafficking venture and the defendant . . . like a hotel renting rooms to people they knew or should have known were engaged in sex trafficking, [or] a continuous business relationship between the trafficking venture and the hotel such that it would appear that the trafficker and the hotels have established a pattern of conduct or could be said to have a tacit agreement." *Id.* at * 14

The Seventh Circuit recognized these two different approaches and determined that § 1591 establishes "the upper limits" of § 1595(a) and should be construed "so that the

civil remedy does not demand more of the plaintiff than a criminal prosecution demands of the government." *G.G. v. Salesforce.com, Inc.*, 76 F.4th 544, 559 (7th Cir. 2023). "Participating does not therefore require more than 'assisting, supporting, or facilitating' a venture that violates Section 1591," nor does it "require direct participation in the sex trafficking"; it merely requires "a desire to promote the wrongful venture's success." *Id*. at 558–60 (citation modified). To meet this definition of "participation in a venture," the Seventh Circuit adopted the *M.A. I* standard that requires a plaintiff to show, at minimum, that the defendant "provides assistance, support, or facilitation to the trafficker through such a continuous business relationship" that permits an inference of a "tacit agreement." *Id*. at 559–60 (citation modified). Courts following this standard have found that providing standard commercial services to traffickers and actual or constructive knowledge of the trafficking activities meets "participation in a venture."

Meanwhile, the D.C. Circuit adopted a definition of "participation in a venture" that closely resembles the one espoused by the Eleventh Circuit. The D.C. Circuit applied its definition to require either a "common purpose, shared profits and risk, or control" like in the Eleventh Circuit, or a "direct and continuous relationship that existed between the parties" like in the Seventh Circuit. *Doe 1 v. Apple Inc.*, 96 F.4th 403, 415–16 (D.C. Cir. 2024). In close alignment with the Eleventh Circuit's stance that "an ordinary buyer-seller transaction" is insufficient, the D.C. Circuit holds that "purchasing a commodity, without more, is not 'participation in a venture' with the seller." *Id*. at 416.

"Finding a consistent standard in the case law for evaluating participation is no simple exercise." *F.C. v. Jacobs Sols. Inc.*, 790 F. Supp. 3d 1158, 1187 (D. Colo. 2025). In attempting to make sense of these emerging approaches, district courts are "all over the map." *Red Roof Inns*, 21 F.4th at 725. The district courts in this Circuit are no exception. Some district courts have applied the Eleventh Circuit's definition of "participation in a venture." *A.B. v. Interstate Mgmt. Co., LLC*, 746 F. Supp. 3d 997, 1006 (D. Or. 2024) (citations omitted); *see Olive v. Mahboubi-Fardi*, No. 2:23-CV-04370-JAK (EX), 2025 WL 2946987, at *11 (C.D. Cal. Sept. 11, 2025) (collecting cases). Several of those courts

have followed the Eleventh Circuit's view that "the standard hotel-guest relationship, standing alone, does not constitute participation in a trafficking venture." *Doe (S.B.C.) v. Six Continents Hotels, Inc.*, 800 F. Supp. 3d 1139, 1146 (W.D. Wash. 2025). In distinguishing between a "passive observer" and "active participant," those courts require that defendants must do something more than merely rent a hotel room to "participate in a venture." *R.T. v. RRI W. Mgmt. LLC*, No. 2:24-CV-590, 2025 WL 961531, at *3 (W.D. Wash. Mar. 31, 2025) (hotel staff were familiar with the sex-trafficker, ignored a victim's visible injuries and a direct plea for help, and served as look-outs for police activity); *Doe (S.A.S.) v. Hilton Domestic Operating Co. Inc.*, 795 F. Supp. 3d 1294, 1308 (W.D. Wash. 2025) (the plaintiff's "testimony that she was trafficked at the [hotel] by two different men for a total of 30 to 60 non-consecutive days between 2002 and 2016 is simply not enough" to withstand summary judgment).

Other district courts have used the definitions found in the TVPRA's criminal statute as the "upper limit" or "benchmark" to define "venture," similar to the Seventh Circuit's approach. *See K.R.D.*, 798 F. Supp. 3d at 1094[5]; *see also G.G.*, 76 F.4th at 554 ("[W]e think it safe to assume that Congress did not intend "venture" in Section 1595, which establishes civil liability, to be any more demanding than "venture" in Section 1591, which establishes criminal liability.").

Regardless of how "participation in a venture" is defined among Ninth Circuit district courts, most have required that a defendant has either a "direct association with traffickers" or "a continuous business relationship between the trafficker . . . such that it would appear that the trafficker and [the defendants] have established a pattern of conduct or could be said to have a tacit agreement." *Doe v. Mindgeek USA Inc.*, 558 F. Supp. 3d 828, 837 (C.D. Cal. 2021); *see also Acevedo v. eXp Realty*, LLC, 713 F. Supp. 3d 740, 783 (C.D. Cal. 2024). In cases where there is no direct association, a plaintiff must "connect the dots between [her] experience as a victim of sex trafficking and the specific defendant

---

[5] In an unpublished opinion, the Ninth Circuit cited this portion of *K.R.D.* approvingly. *Croft v. Dolan*, No. 24-6150, 2025 WL 3720844, at *3 (9th Cir. Dec. 23, 2025) and, while not precedential, it indicates to this Court that the Northern District of California's formulation of "participation in a venture" is not inconsistent with § 1595(a).

in the lawsuit." *B.J. v. G6 Hosp., LLC*, No. 22-CV-03765-MMC, 2023 WL 6120682, at *4 (N.D. Cal. Sept. 18, 2023). To connect those dots, a plaintiff may show that a defendant hotel rented rooms to people it knew or should have known were engaged in sex trafficking with "facts supporting the defendant's knowledge of the venture in which it allegedly participated." *Id.* (citation modified); *see also Mindgeek*, 558 F. Supp. 3d at 837; *Acevedo*, 713 F. Supp. 3d at 783.

In the absence of Ninth Circuit authority, the Court declines to apply any specific standard or definition of "participation in a venture" and assumes only for the purposes of resolving the motions that element is met here. Accordingly, Plaintiff's beneficiary liability claims turn on whether Scottsdale Inn knew or should have known that its rental of hotel rooms was to someone engaged in sex trafficking.

The Ninth Circuit assumes that the *mens rea* § 1595(a) imposes is a negligence standard because "the phrase knew or should have known usually connotes negligence. And negligence is a less culpable mental state than actual knowledge or recklessness." *Ratha I*, 35 F.4th at 1177 (citation modified). Under the Ninth Circuit's guidance in *Ratha I*, district courts have held that "a plaintiff may not rely solely on general allegations that a defendant was aware of sex trafficking to establish actual or constructive knowledge of specific instances of sex trafficking." *S.B.C.*, 800 F. Supp. 3d at 1143 (citation modified); *see also Ratha I*, 35 F.4th at 1177. "Rather, a plaintiff must plead facts establishing that a defendant knew or should have known that the plaintiff was being trafficked or regarding a specific trafficking enterprise." *S.B.C.*, 800 F. Supp. 3d at 1143 (citation modified). District courts have also held that "the TVPRA 'does not address commercial sex activity generally.'" *A.B. v. Wyndham Hotels & Resorts, Inc.*, 532 F. Supp. 3d 1018, 1027 (D. Or. 2021) (citation modified). "[I]t is not enough to establish a defendant's knowledge of general commercial sex taking place at its property . . . A plaintiff must allege that defendants knew or should have known of a venture that involved sex trafficking by force, threat of force, [fraud,] or coercion." *Christina T. v. Bellagio LLC*, 806 F. Supp. 3d 1185, 1195 (D. Nev. 2025) (collecting cases); *see* 18 U.S.C. § 1591(a) (prohibiting "means of

force, threats of force, fraud, coercion . . . to cause the person to engage in a commercial sex act.").

Plaintiff argues that Scottsdale Inn had constructive knowledge that its renting of rooms and providing services (*e.g.*, Wi-Fi, towels) facilitated sex trafficking because: (1) Plaintiff displayed signs that she was trafficked while at the hotel; (2) it was generally known that sex trafficking occurred in the Hotel's vicinity; and (3) Scottsdale Inn failed to implement policies or trainings that would have enabled staff to detect sex-trafficking. (Resp. II at 13–16.)

The Court first addresses the signs that Plaintiff herself displayed while at the Hotel. According to Plaintiff, she was limited in her movement while at the Hotel, which was an indicator of being controlled. (ASOF II ¶ 42.) But the portion of Plaintiff's deposition she cites to support this argument demonstrates that, when she was working alone at the Hotel, she could leave her hotel room to get food, go to the store, pay the front desk for another night, and walk through the hotel for ice or vending machines. (Doc. 155-2 at 16–17.) Even in viewing these facts in a light favorable to Plaintiff, the Court can draw no inference that Hotel staff would or could observe that she was "limited" in her movement, as these are the very behaviors expected of a hotel patron who may, from time to time, walk about the hotel or leave and return with food or store items.

Plaintiff also argues that she appeared "anxious because of J.'s digital monitoring," and this is a "red flag" of sex-trafficking. (Resp. II at 13; ASOF II ¶ 39.) Assuming that Plaintiff was anxious, the evidence in the record does not show that the Hotel staff could have observed it. Plaintiff declares that J.'s communications with Plaintiff involved her meetings with the "johns," (*see* 155-3 ¶ 3), and those meetings took place in the privacy of the hotel room (SOF II ¶ 48; CSOF II ¶ 48). And while Plaintiff avers that she would have to "immediately" answer J.'s phone calls, there is no evidence that Plaintiff took those phone calls around Hotel staff. Plaintiff's deposition testimony does not support that she was generally "anxious," either. At her deposition, Plaintiff testified that she believed J.

- 12 -

"was always around" even though he was never physically present at the Hotel, but she "didn't feel anything" about it. (Doc. 155-2 at 16.)

Plaintiff points out other signs of her sex trafficking, including that she paid with cash or prepaid card, rented on a day-to-day basis, used the "Do Not Disturb" sign, interacted with hotel staff at the door of the room, possessed sex paraphernalia in the room, had visitors throughout the day and night,[6] was "young looking" in appearance, showed signs of drug use and sleep deprivation, and lacked personal belongings.[7] (Resp. II at 13–14.) The Court will assume, for the moment, that Scottsdale Inn knew of or should have been aware of these signs. Viewing all these facts together in a light favorable to Plaintiff, the only reasonable inference that can be drawn is that Plaintiff was engaged in commercial sex activity. But "the TVPRA 'does not address commercial sex activity generally.'" *Wyndham Hotels.*, 532 F. Supp. 3d at 1027, and "it is not enough to establish a defendant's knowledge of general commercial sex taking place at its property." *Christina T.*, 806 F. Supp. 3d at 1195. This, after all, makes sense, because the TVPRA prohibits "a venture that involved sex trafficking by force, threat of force, [fraud,] or coercion." But none of the facts above would notify Hotel staff that Plaintiff was *forced* or *coerced* into commercial sex activity.

There is a glaring difference between the facts of this case and those cases addressed across the country where courts have found the hotel knew or should have known the rental was engaged in trafficking. Here, the evidence shows that Plaintiff's trafficker was never present at the Hotel and never had any interaction with Hotel staff. Rather, Plaintiff acted

---

[6] The parties present conflicting evidence about whether lobby staff could see activity in the parking lot. (*See, e.g.*, Doc. 142 at 118–19, Doc. 155-2 at 18). It is agreed, though, that staff could see cars as they drove through the singular, north-facing entrance from the street. Notwithstanding whether the staff had a limited view of the parking lot from the lobby, Ms. Lewis testified that staff were often in or around the parking area during the day shift and at least once every one to two hours during the night shift. (Doc. 142 at 136.)

[7] Notably, only one of these signs is one that, according to Plaintiff's own experts, would indicate control, coercion, harm, fear, or disorientation, and that is the lack of personal possessions. (*See* Doc. 155-7 at 11; Doc. 155-8 at 18.) The record demonstrates that Plaintiff would arrive at the hotel "with a backpack," which indicates that she did, in fact, have personal possessions with her. While her possessions may have been minimal, the Court doubts that this fact would lead a reasonable juror to believe that Scottsdale Inn must have known that Plaintiff was being trafficked because is not uncommon that hotel guests may have but a backpack of belongings when they check in for only one night.

- 13 -

out her trafficker's commands to pay for rooms, post advertisements, and meet with the johns. Scottsdale Inn argues that J.'s absence is fatal to Plaintiff's beneficiary liability claim (Mot. at 12), while Plaintiff argues that "[a] hotel cannot escape liability merely because the trafficker uses an intermediary or victim to pay for the room" (Resp. II at 8). The Court cannot accept, as Scottsdale Inn urges, that a trafficker's absence from a hotel property is an absolute bar to § 1595(a) beneficiary liability claims. There is simply no overt requirement for this in the statute or case law. As Plaintiff astutely points out, a victim can be forced or coerced to engage in commercial sex even from a distance. (Resp. II at 16.) The problem, though, is that this kind of distant, remote coercion and force is not observable, or even deducible, by outsiders like hotel staff, even if they were trained in identifying signs of coercion or force. Because the TVPRA does not prohibit general commercial sex activity, beneficiary liability claims often turn on the extent to which a hotel would or should have observed a trafficker accompanying the victim, surveilling the victim or abusing the victim. None of these observations could have been made here on the facts before the Court. What is left are general indicia that Plaintiff was engaged in commercial sex activity, but not that she was forced or coerced into that activity.

There is also no evidence in the record that shows any specific sex trafficking venture occurred at the Hotel such that staff would be on notice that trafficking occurred there. *See Doe (S.B.C.) v. Six Continents Hotels, Inc.*, 800 F. Supp. 3d 1139, 1146 (W.D. Wash. 2025) ("[A] plaintiff must plead facts establishing that a defendant knew or should have known that the plaintiff was being trafficked or regarding a specific trafficking enterprise.") Plaintiff points out that ██████████████████████████████ ████████████████████████████████████████ ███████.[8] (ASOF II ¶ 76; *see* Doc. 156-2 at 12.) Aside from this testimony, it is undisputed that only one police call to the Hotel involved prostitution, and it involved Plaintiff who was alone and admitted that "she was in Scottsdale to commit acts of prostitution." (Doc. 155-9 at 5.) Plaintiff's expert Ms. Keyhan opines that sex trafficking generally occurred

---

[8] The Court redacts the above confidential information and simultaneously files an unredacted version of this Order under seal.

within the Wyndham brand and near the Scottsdale Inn, but there is no evidence, such as a customer review or news article, that trafficking occurred at the Scottsdale Inn. (*See* Doc. 155-7 at 27–28). While Ms. Keyhan notes that the Hotel "sits at the eastern end of a well-documented prostitution corridor that runs the length of Indian School Road from I-17 in Phoenix into Old Town Scottsdale," she cites to numerous articles that are about incidences or events that occurred several years *after* Plaintiff stayed at the Hotel, and none of them are specific to the Scottsdale Inn.[9] According to the case law, this evidence is insufficient to create constructive knowledge that a trafficking enterprise was occurring at the Hotel. *Ratha I*, 35 F.4th at 1177 (evidence of trafficking in the defendant's industry generally is insufficient to meet the *mens rea* requirement); *Wyndham Hotels*, 532 F. Supp. 3d at 1026 ("[G]eneral knowledge of commercial sex activity occurring at hotels across the United States is insufficient."); *Tyla D. v. MGM Resorts Int'l*, No. 2:24-CV-00698-APG-BNW, 2024 WL 4839744, at *4 (D. Nev. Nov. 19, 2024) ("It is not enough to establish a defendant's knowledge of general commercial sex taking place at its property.").

Plaintiff argues that, "[a]t the very least, the record supports charging Scottsdale Inn with constructive knowledge based on its failure to exercise reasonable care in responding to the known risk of sex trafficking." (Resp. II at 14–15.) But whether Scottsdale Inn could have adopted "preventative measures," including hiring a security guard, monitoring security cameras, or documenting or reporting signs of potential criminal activity, does not change that, based on the facts and evidence provided by Plaintiff, Scottsdale Inn would not have known that Plaintiff was being *forced* or *coerced* into the commercial sex activity, or that there was a sex trafficking venture generally occurring there. To the extent that Plaintiff suggests these measures could have thwarted Plaintiff's trafficker from choosing the Hotel as the situs for trafficking Plaintiff, the TVPRA does not impose a duty upon hotels to police or prevent sex trafficking. *Wyndham Hotels*, 532 F. Supp. 3d at 1027.

. . .

---

[9] Ms. Keyhan cites to only two articles that were about incidences of trafficking or prostitution before Plaintiff stayed at the Hotel. One article noted a 2010 anti-prostitution protest on Indian School Road, and the other was a case study referencing one child trafficking incident at a different but nearby hotel in 2005. (*See* Doc. 155-7 at 30–31.)

Based on these facts and viewed in a light most favorable to Plaintiff, a reasonable juror could not find that Scottsdale Inn would or should have known that Plaintiff was being trafficked at the Hotel. Plaintiff having failed to meet her burden in producing evidence supporting the third element of § 1595(a), summary judgment in favor of Scottsdale Inn is appropriate. *Nissan Fire*, 210 F.3d at 1102; *Celotex*, 477 U.S. at 322.

### 2. *Wyndham*

Wyndham argues that Plaintiff lacks evidence that Scottsdale Inn reported any sex trafficking occurring at the Hotel, or that Wyndham or its subsidiary HJI inspected the Hotel during the timeframe that Plaintiff stayed at the Hotel (Mot. I at 8–9). Wyndham also argues that there is no evidence that data about Scottsdale Inn's room reservations, guest identification, payment information, and guest Wi-Fi usage, assuming Wyndham collected and monitored that data, would have notified Wyndham that Plaintiff was being trafficked at the Hotel. (Mot. I at 9.) What remains, according to Wyndham, is Plaintiff's evidence that Wyndham generally knew or should have known that sex trafficking occurred at its subsidiary hotels. (Mot. I at 9.) Wyndham argues that such generalized knowledge is insufficient to establish the *mens rea* element of § 1595(a). (Mot. I at 9–10.)

Plaintiff concedes that general knowledge of trafficking in hotels is not, on its own, sufficient to satisfy the *mens rea* element. (Resp. I at 8–9.) She instead argues the Hotel was "in an area with a heightened risk of trafficking, had frequent law-enforcement activity on site, and its staff saw signs of commercial sex at the property." (Resp. I at 5.) Assuming, for the moment, that Wyndham knew these things, the TVPRA does not address commercial sex activity, nor does it impose a duty on Wyndham to prevent or police prostitution or sex trafficking even where there is a heightened risk for it.

Plaintiff next argues that Wyndham monitors online reviews, solicits guest feedback, and inspects and visits hotel properties. (Resp. I at 10.) But Plaintiff presents no evidence that guests complained of prostitution or trafficking taking place at the Hotel at all, or that Wyndham had inspected or visited (or was required to inspect or visit) the Hotel

during the time that Plaintiff stayed there such that Wyndham or its subsidiary would have observed or been on notice that trafficking was occurring there.

Plaintiff's remaining arguments, that Hotel staff knew or should have known that Plaintiff was being trafficked (Resp. I at 10) and that Wyndham should have ensured that Hotel staff received anti-trafficking training or adopted policies that prevented sex trafficking (Resp. I at 13–14), have each been addressed above and similarly fail.

In sum, Plaintiff fails to produce evidence that, when viewed in a light most favorable to her, would establish the existence of the *mens rea* element necessary for a beneficiary liability claim against Scottsdale Inn and Wyndham. Plaintiff's only remaining claim against Wyndham arises from a vicarious liability theory. The Court assumes for purposes of analyzing the claim that Scottsdale Inn is an agent of Wyndham. A theory of vicarious liability still fails because there is insufficient evidence supporting Scottsdale Inn's own liability under § 1595(a), *see* Restatement (Third) Agency § 7.03, or that Wyndham owed a duty to or held a special relationship with Plaintiff that would, if present, make Wyndham vicariously liable, *see* Restatement (Third) Agency § 7.05.

**IT IS ORDERED** directing the Clerk of Court to file under seal the documents currently lodged under seal at docket entries 145, 154, 156, 158, 162, and 163.

**IT IS FURTHER ORDERED** granting Defendant Wyndham Hotels & Resorts, Incorporated's Motion for Summary Judgment (Doc. 120) and Defendant Scottsdale Inn LLC's Motion for Summary Judgment (Doc. 124).

**IT IS FURTHER ORDERED** denying as moot Defendant Scottsdale Inn's Motion to Exclude Plaintiff's Expert Rochelle Keyhan, Motion to Exclude Plaintiff's Expert Robert Cotto, and Motion for Rule 37(c)(1) Sanctions (Docs. 141, 143, 144).

. . .

. . .

. . .

. . .

. . .

**IT IS FURTHER ORDERED** directing the Clerk of Court to enter judgement in in favor of Defendants Wyndham Hotels & Resorts Incorporated and Scottsdale Inn LLC and close this case.

Dated this 13th day of May, 2026.

_____
Honorable John J. Tuchi
United States District Judge